COMMITTEE OF CENTRAL AMERICAN REFUGEES ("Comite de Refugiados Centroamericanos" or "CRECE"), Political Asylum Emergency Representation Program, Andres Miras–Villalta, Jaime Olano–Chicas, Robert Parraga, Rafael Montoya Mejia, Sebastian Francisco Miguel, Arnoldo Sanchez Melendez, Juan Pedro Francisco, and Jose Mario Olmos–Gomez, on behalf of themselves and of all others similarly situated, Plaintiffs,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Edwin R. Meese, as Attorney General of the United States, Alan C. Nelson, as Commissioner of the Immigration and Naturalization Service, and David Ilchert, as Director of the San Francisco District of the Immigration and Naturalization Service, Defendants.

No. C–85–2167–JPV.

United States District Court, N.D. California.

March 18, 1988.

Robert E. Borton, John M. Farrell, Charles F. Robinson, Kevin R. Johnson, Sergio Garcia–Rodriguez, Heller, Ehrman, White & McAuliffe, Robert Rubin, Ignatius Bau, San Francisco Lawyers' Committee for Urban Affairs, San Francisco, Cal., for plaintiffs.

Richard K. Willard, Joan E. Smiley, Linda Wendtland, Madelyn E. Johnson, Civil Div., Dept. of Justice, Washington, D.C., Joseph Russoniello, Susan L. Kamlet, Office of U.S. Atty., N.D.Cal., San Francisco, Cal., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

VUKASIN, District Judge.

## I. PROCEDURAL HISTORY

On March 6, 1985, plaintiffs, the Committee of Central American Refugees, the Political Asylum Emergency Representation Program, and eight individuals, representing a class of deportable aliens, filed a complaint against defendants, the Immigration and Naturalization Service (hereinafter the "INS"), Edwin R. Meese, as Attorney General for the United States, Alan C. Nelson, as Commissioner of the INS, and David Ilchert, as Director of the San Francisco District of the INS. Plaintiffs' complaint alleged, *inter alia*, that the INS' policy of transferring aliens to detention facilities at El Centro, California and Florence, Arizona violated the due process clause of the Fifth Amendment.

On July 19, 1985, plaintiffs moved for class certification and filed a second motion for a preliminary injunction on behalf of the class, seeking to prohibit the INS from transferring class members to said detention facilities. In its order of September 20, 1985, this Court granted the motion for class certification but denied the motion for a preliminary injunction. Plaintiffs appealed this Court's order denying the motion for a preliminary injunction, and the United States Court of Appeals for the Ninth Circuit affirmed. *Committee of Central American Refugees v. Immigration and Naturalization Service*, 795 F.2d 1434 (9th Cir.1986), *as amended*, 807 F.2d 769 (9th Cir.1987). On August 17, 1987, this Court denied plaintiff's motion for summary judgment.

Plaintiffs now seek a permanent injunction. Trial on this matter was held without jury from September 9, 1987 to October 2, 1987. After plaintiffs completed presentation of their evidence, defendants moved for dismissal pursuant to Rule 41(b), F.R. Civ.P., on the ground that, based upon the facts and the law, plaintiffs had shown no right for relief. On October 2, 1987, this Court ruled from the bench and granted defendants' motion to dismiss.

These findings of fact and conclusions of law embody the Court's ruling from the bench on October 2, 1987, as well as the evidence presented.

## II. FINDINGS OF FACT

1. That the defendant, Edwin R. Meese, is sued in his capacity as the Attorney General of the United States. As Attorney General he is responsible for the administration and enforcement of all laws relating to the immigration, deportation and naturalization of aliens pursuant to section 103(a) of the Immigration and Nationality Act (hereinafter the "Act"). 8 U.S.C. § 1103(a).

2. The defendant Immigration and Naturalization Service ("INS") is an agency within the United States Department of Justice to which the Attorney General has delegated his authority to enforce the Im-

migration and Nationality Act and to promulgate regulations and policies for the Act's implementation. 8 C.F.R. §§ 2.1, 100.2(a).

3. The defendant Alan C. Nelson is the Commissioner of the INS and is under the supervision and direction of the Attorney General. He is responsible for directing the administration of the INS, enforcement of the Act, and formulation and implementation of INS policy. 8 C.F.R. §§ 2.1, 100.-2(a).

4. The defendant David Ilchert is the Director of the San Francisco District of the INS and is under the supervision and direction of the Commissioner of the INS, the Western Regional Commissioner of the INS, and the Attorney General. He is responsible for directing the administration of the INS, enforcement of the Act, and formulation and implementation of INS policy within the San Francisco District. 8 C.F.R. § 100.2(e).

5. On September 20, 1985, the named individual plaintiffs were certified as the representatives of a class consisting of "[a]ll persons from El Salvador and Guatemala who maintain their residence in the San Francisco District ("District") of the Immigration and Naturalization Service ("INS") who have been, are, or will be apprehended and detained in such District by officials of the INS and who have been, are, or will be subject to transfer to the alien detention facilities at El Centro, California; Florence, Arizona; or Las Vegas, Nevada."

6. At the trial of this action, plaintiffs offered the testimony of five named plaintiffs and class members, three by live testimony and two by deposition. One named plaintiff, Jaime Olano–Chicas, is a native and citizen of El Salvador who last entered the United States in February 1982. He was apprehended by INS officers in San Francisco in October of 1984 and charged with deportability as an alien convicted of a drug-related violation. He was transferred to the Service Processing Center ("SPC") in El Centro for detention. While in El Centro, he contacted Paula Pearlman, an attorney in El Centro, and Mark Silverman, an attorney in San Francisco. Mr. Olano–Chicas appeared before an immigration judge ("IJ") in deportation proceedings without representation. During those proceedings, he was fully apprised of his right to apply for asylum but knowingly stated that he did not wish to apply. He was represented by counsel for an appeal to the Board of Immigration Appeals ("BIA") and for a bond redetermination hearing.

7. Named plaintiff Arnoldo Sanchez Melendez is a native and citizen of El Salvador who entered the United States in November 1981. He was arrested by INS officers at or near Oakland, California in April 1984. While in San Francisco, he contacted an attorney who failed to file a G–28 appearance form on his behalf. Mr. Sanchez Melendez was transferred to the SPC in Florence. He contacted the Central American Refugee Project ("CARP") in order to be represented by counsel at his bond redetermination hearing. He then decided to appear at his bond hearing without representation and told the attorney from CARP to "forget it." He submitted an application for asylum with the assistance of counsel. On May 11, 1984, he posted bond, was released from custody, and his motion to change venue to San Francisco was granted.

8. Class member Pastor Pineda Hernandez is another native and citizen of El Salvador who entered the United States without inspection, was subsequently apprehended by the INS, and was transferred to El Centro. Although he appeared *pro se* at this asylum merits hearing, he testified that he called none of the attorneys on the legal services list, other than Rudy Cardenas, because he thought they would all charge him. He also testified that the list contained a statement that particular attorneys thereon, not including Mr. Cardenas, might be willing to provide representation at no cost. Mr. Pineda was represented before the BIA by an attorney named Riley Gordinier, whose services were obtained through Leslie Johnson. Miss. Johnson became Mr. Pineda's "contact" at El Centro subsequent to his asylum hearing, and represented Mr. Pineda at a bond hearing at

which his bond was lowered. Two attorneys and a nun from San Francisco eventually bonded Mr. Pineda out of custody.

9. Class member Jose David Garcia Romero is a native and citizen of El Salvador who entered the United States without inspection in February 1986. He was apprehended by the INS and transferred to the El Centro SPC in December 1986. Although he received a list of free legal services from the immigration court, Mr. Garcia did not call any attorneys or organizations located in El Centro. With the assistance of an attorney from San Francisco, Mr. Garcia received a reduction of his bond in July 1987. The following month, be bonded out of custody, and his unopposed motion for change of venue was granted. Mr. Garcia has obtained counsel to represent him at the hearing on his application for asylum, which is scheduled to take place in San Francisco at a future date.

10. Class member Dagoberto Hernandez is a native and citizen of El Salvador who last entered the United States in March 1984. He was arrested by INS officers in March 1987. He was transferred to the SPC in El Centro, California. On March 19, 1987, he appeared before an immigration judge for a bond reduction hearing. Although unrepresented, Mr. Hernandez obtained a fifty-percent reduction in the bond amount. After the hearing the immigration judge gave him a list of attorneys. At his subsequent Order to Show Cause hearing, on April 19, 1987, the immigration judge asked Mr. Hernandez if he wished to apply for asylum in the United States. The hearing was adjourned to allow him to apply. Since that hearing, Mr. Hernandez' hearing has been continued two additional times to allow him to obtain counsel. He was interviewed by a representative of CAM but was denied representation because CAM determined that he was not eligible for asylum. He testified that he also contacted Leslie Johnson, an attorney in El Centro working with another *pro bono* program which represents Salvadoran and Guatemalan asylum applicants.

11. Named plaintiff Jose Mario Olmos–Gomez is a native and citizen of El Salvador who last entered the United States in January 1982, following a prior illegal entry in December 1981. Although plaintiffs failed to offer any trial or deposition testimony by Mr. Olmos–Gomez, plaintiffs did offer the certified record of his immigration court proceedings. This record reveals that Mr. Olmos–Gomez was arrested by INS officers in Martinez, California on January 18, 1985 and was then transferred to the SPC in Florence. Although he appeared at his bond redetermination hearing without counsel and had been convicted of an unrelated felony, his bond was reduced on January 24, 1985. With the assistance of counsel, he filed an asylum application with the immigration court on February 6, 1985. He appeared *pro se* at his asylum merits hearing, but was represented before the BIA and the Ninth Circuit Court of Appeals. On June 3, 1985, he posted bond was was released from custody. Subsequently, in September 1986, his bond was breached when he failed to appear at the INS office.

12. There are five other named plaintiffs who were not produced at trial and whose deposition testimony plaintiffs did not offer into evidence. In affirming this Court's denial of plaintiffs' motion for a preliminary injunction, the Ninth Circuit found that nearly all of the named plaintiffs were shown to have received the assistance of counsel after their transfers.

13. The Committee of the Central American Refugees and the Political Asylum Emergency Representation Project, organizations located in San Francisco which render legal and other assistance to detainees in immigration proceedings, withdrew as plaintiffs on September 20, 1985.

14. Subsequent to the apprehension of an illegal alien within the San Francisco District, an INS officer serves the alien with an Order to Show Cause ("OSC"), which charges the alien with deportability under one or more provisions of the Act. The reverse side of the OSC describes other procedural rights, and notifies the alien of the amount of his bond as well as his right to request a redetermination from an immigration judge (IJ). Although the OSC

is in English, it is the policy and practice of the INS to explain the OSC's contents to a non-English-speaking alien. It is also the policy and practice of the INS to provide the alien with various forms which contain a full explanation of his rights. Form I–274 informs the alien in Spanish of his right to: (1) obtain a deportation hearing; (2) post bond; (3) request voluntary departure; (4) be represented by counsel at no expense to the government; (5) communicate with is country's consular officials; and (6) request a list of available free legal services. It is the policy and practice of the INS that during processing, the processing officer will read the I–274 to the alien in Spanish if the alien has stated he is unable to read. If the alien states he does not understand the contents, the officer explains it to him.

15. The San Francisco District also provides apprehended aliens with Form I–618, a notice of the alien's right to appeal any adverse determination by the immigration judge to the Board of Immigration Appeals ("BIA") and to remain in the United States during the pendency of the appeal.

16. If the alien is Salvadoran, the INS officer also serves him with a notice in Spanish of his right to apply for political asylum, pursuant to the preliminary injunction entered in *Orantes–Hernandez v. Smith,* 541 F.Supp. 351 (C.D.Cal.1982). The notice states that "you may be eligible for political asylum if you have reason to believe that you would be persecuted because of your race, religion, nationality, membership in a particular social group or political opinions of you were returned to El Salvador." The notice also advises the alien to inform an INS officer if he does wish to apply for asylum.

17. After the INS has determined that an OSC should be issued, it designates the situs of the alien's deportation hearing. If the Assistant District Director for Investigations determines that the case should remain in San Francisco, the OSC will instruct the alien to report to the immigration court in San Francisco. Otherwise, the OSC will indicate "date, time and place to be set." It is the policy and practice of

the INS, subject to availability of detention space, to leave the case in San Francisco if the alien has immediate family lawfully present in that area or if an attorney has filed a G–28 form indicating his representation of the alien.

18. It is the policy and practice of the INS to recognize a valid attorney-client relationship when an attorney provides to a responsible officer of the INS in writing the information contained on a fully executed Form G–28. *See* 8 C.F.R. § 292.4(a). The INS does not rely soley upon the alien's assertions regarding his representation because such assertions have often proved to be inaccurate or unreliable. On several occasions, aliens have stated that they were employing a certain attorney, or had provided a G–28 form naming that attorney, when the attorney did not in fact represent the alien.

19. To prevent overcrowding at one or more of the INS' detention facilities, and to distribute the detention population among them to achieve greater efficiency, the INS transfers aliens from one facility to another as availability of space requires. At any point after the institution of deportation proceedings, the alien may move for a change of venue and is not required to appear at a hearing to make such a request.

20. Aliens transported out of the San Francisco District are currently sent either to the INS Service Processing Center ("SPC") in El Centro, California or through that facility to the SPC in Florence Arizona. Aliens of all nationalities have been sent to the El Centro facility, or a predecessor facility also in El Centro, from San Francisco and other districts for over thirty years. The Florence facility officially opened in 1984.

21. In 1984, projected budget deficits of substantial magnitude caused the INS to decrease the number of aliens detained in the San Francisco District pursuant to a contract between the U.S. Marshal's Service and the Oakland City Jail. Whereas the approximate man-day detention costs at the INS-owned facilities in El Centro and Florence have run from $14 to $18 and $33

to $36 respectively, the contractual cost for detention at Oakland has run from $55 to the current cost of $70. INS has made several as yet unsuccessful attempts to establish additional detention facilities in the San Francisco District.

22. If the INS were required to detain additional aliens in Oakland, it would have to compensate for the increased detention costs by releasing aliens on recognizance or setting their bonds at an artificially low level despite the Attorney General's determination that such aliens should be detained.

23. Aliens detained at El Centro or Florence have ample opportunity to bond out, obtain counsel, and apply for political asylum. If the alien has requested a bond redetermination, a hearing is scheduled shortly after his arrival at the facility. Before the bond hearing, the alien can arrange for an attorney to provide representation in-person or by telephone. The judge will consider, on an equal basis, all equities possessed by the alien anywhere in the United States. An alien's bond may be paid at an INS office anywhere in the country; bonds are paid at the San Francisco District Office for El Centro detainees on a daily basis. After an alien has bonded out of either El Centro or Florence, the immigration court will routinely grant a motion for change of venue to the court with jurisdiction over the alien's new location.

24. If a detainee at El Centro or Florence is not represented at his initial bond redetermination hearing, the IJ provides a list of free legal services available and strongly recommends that the alien find an attorney. Legal services lists are also posted at each facility. After furnishing the list, the judge continues the bond hearing and calendars the hearing on the Order to Show Cause (also known as a "master calendar hearing" or "status call") for a fixed date. When an El Centro detainee is represented, his bond and deportation hearings are scheduled on a separate calendar for the pertinent attorney.

25. The OSC hearing or status call is a brief proceeding at which aliens appear in groups ranging from two to twenty-nine and which is intended only to narrow the issues prior to the hearing on the merits. If an El Centro detainee has not obtained an attorney by the time of his status call, the IJ will continue that hearing for several more weeks. The immigration judges at Florence also routinely grant continuances in order to permit aliens to engage attorneys.

26. If the alien lacks counsel at the rescheduled OSC hearing, the IJ at both Florence and El Centro asks whether the alien is afraid to return to his home country and, if the answer is in the affirmative, informs him of his right to apply for political asylum. The judge also tells the alien to speak up if he does not understand something so that the judge can explain and asks the alien individually whether he understands each of his rights. The judge will not move on until the alien indicates he understands.

27. An alien requesting asylum is given an application, in Spanish, to be filed by a date certain, usually several weeks later. The immigration court permits the alien to complete the application in Spanish and then translates the information into English. The IJ also calendars an asylum merits hearing for several months into the future, thus allowing time for preparation of the case as well as receipt of an advisory opinion from the State Department. During this period, the alien is free to procure counsel.

28. On occasion, an alien detained at El Centro or Florence will ask an INS officer questions concerning his immigration case. It is the policy and practice of the INS for employees to answer truthfully any questions asked by an alien, but not to advise the alien or make decisions for the alien or influence the alien in the making of his decision.

29. Attorneys, paralegals working for an attorney, and accredited representatives are given access to detained aliens at the El Centro and Florence facilities at regular hours every day and when the need arises at additional times. INS policy is to allow the maximum number of hours for visiting consistent with security and efficient oper-

ations. The visiting hours are posted at each facility.

30. The evidence produced by plaintiffs does not support their contention that counsel is unavailable at El Centro and Florence. The Imperial Valley Immigration Project (also known as "Centro de Asuntos Migratorios" or "CAM") is an organization in El Centro which provides *pro bono* representation to aliens. At times, CAM has represented in immigration court 70–90% of El Centro detainees that its employees have interviewed. Each client is interviewed several times prior to submission of his asylum application. Appeals of asylum denials before the BIA and the Ninth Circuit are usually assigned to volunteer attorneys from other parts of the country, including attorneys from the Political Asylum Emergency Representation Program in San Francisco.

31. The current "staff attorney" at CAM's El Centro office is Richard Garcia, who is not a member of the bar but is an accredited non-attorney representative. Two CAM attorneys stationed in San Diego, Marco Antonio Rodriguez and Rosemary Esparza, also represent detainees at deportation and bond hearings before the El Centro immigration court. In June 1987, CAM hired a paralegal named Carmen Mejia. Mr. Garcia and Miss Mejia regularly conduct interviews at the El Centro SPC for the purpose of accepting new bond and asylum cases.

32. Detainees at El Centro may also receive free legal assistance from the El Centro Asylum Project ("the Project"), which is sponsored by the California Rural Legal Assistance program. The Project opened its office in August 1987 and accepted approximately thirty cases by the following month. Through its staff attorney, Leslie Johnson, the Project provides *pro bono* representation to detained Salvadorans and Guatemalans who wish to apply for asylum. The Project also employs a legal assistant.

33. In addition to the *pro bono* representation by CAM and the El Centro Asylum Project, representation for a fee is available from several attorneys located in El Centro. Attorneys who have appeared in immigration court, and have had their own individual case calendars, include Rudy Cardenas, Eric Beaudikofer, Oscar Ruiz de Chavez, Gustavo Roman, and Jonathan Foerstel. Most of these attorneys represent aliens at asylum hearings and accept some cases on a *pro bono* or low fee basis, often after being appointed to handle such cases by an immigration judge. Over one hundred attorneys practice law in the Imperial Valley, which encompasses El Centro.

34. Susan Giersbach Rascon is a staff attorney for the Central American Refugee Project ("CARP") in Phoenix, which is approximately 65 miles from Florence. CARP provides representation in asylum cases to indigent Florence detainees of Central American origin. CARP has never refused a Florence detainee's asylum case on the basis of workload alone. The organization has represented every detainee whom it believed to be qualified for asylum and to have an urgent need for legal assistance. Over thirty lawyers have provided assistance to CARP on a volunteer basis.

35. A staff member of CARP interviews a detained client for several hours before submitting the asylum application and for several more hours the day before the merits hearing. Many of CARP's appeals before the BIA and the Ninth Circuit have been assigned to volunteer attorneys from other areas.

36. Father David Myers has also provided *pro bono* representation to Florence detainees. From May 1984 to September 1985, he visited the Florence facility in search of aliens needing representation and was referred all calls placed to CARP by Florence detainees. During this period, Father Myers was able to represent 90% of the detainees whom he had interviewed and who desired political asylum. Another attorney, Jess Cardenas, has also visited the SPC regularly.

37. The Court's finding of access to counsel is not altered by the various charts and summaries sponsored into evidence by Kathleen Ewins and Stephen Hankins. Exhibits P–21 through P–23 and P–27 through

P–29 are derived from El Centro and Florence hearing calendars and purport to show a large percentage of unrepresented aliens. However, the exhibits are misleading in that they only refer to those specific hearings at which an immigration judge issued a final order of deportation or voluntary departure. Completely excluded are adjourned proceedings, proceedings that fail to result in a final disposition due to the alien's bonding out of custody, and proceedings which result in a disposition other than an order of deportation or voluntary departure. The exhibits are also misleading in that they were submitted for purposes of comparison with Exhibit P–5, a table which was compiled from hearing calendars for the San Francisco immigration court, but which summarizes different types of hearings than the tables compiled from the El Centro and Florence calendars. While the latter tables only summarize those hearings resulting in an order of deportation or voluntary departure, the San Francisco table summarizes all hearings generally. Additionally, Exhibits P–21 through P–23 and P–27 through P–29 fail to establish that the aliens listed as "pro se" made any attempt to secure counsel, or were eligible for or desired any form of relief from deportation for which they did not apply.

38. Plaintiffs have also offered Exhibits P–24 and P–25, tables which purport to show that 100% of the respondents at "quick deport" hearings are unrepresented. These tables establish nothing more that a truism, in that represented aliens are not placed on the "quick deport" calendar in the first place, but are instead placed on their attorney's pleading calendar. The Court further finds that aliens on the "quick deport" calendar have merely waived their right to more extended notice of their hearing, and are accorded the same rights and opportunities as other aliens.

39. The Court is also unpersuaded by Exhibit P–65, a table derived from a sampling of El Centro and Florence docket cards. Although this exhibit is not artificially limited to hearings resulting in an order of deportation or voluntary departure, it still fails to demonstrate that the aliens listed as "pro se" made any attempt to secure counsel, or were eligible for or desired any form of relief from deportation for which they did not apply. The table also fails to reflect any representation by counsel after the alien bonded out of El Centro or Florence and venue was changed to another location. The Court further notes that plaintiffs failed to submit a single exhibit specifically comparing the proportions of represented and unrepresented aliens at *asylum merits* hearings at El Centro and Florence. Indeed, testimony has established that the great majority of aliens having such hearings are able to obtain counsel.

40. When an asylum applicant proceeds *pro se*, the IJ takes the necessary steps to provide a full due process hearing. The IJ advises the alien of his rights, questions the alien in an attempt to draw out the facts, follows up on any new information brought out during the hearing, and liberally allows introduction of supporting evidence.

41. If the alien's asylum application is denied, he may appeal to the BIA and then to the Ninth Circuit Court of Appeals. *See* 8 U.S.C. § 1105a, 8 C.F.R. § 242.21. In those forums, he may challenge the validity of his deportation order on the basis of an alleged denial of the right to counsel. The Political Asylum Emergency Representation Program accepts appellate cases from aliens detained at El Centro and Florence (*see* trial testimony of Mark Silverman and Leslie Simon).

## III. CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction, pursuant to 8 U.S.C. § 1329, to review the issue of the Attorney General's broad authority to detain and transfer aliens to detention facilities.

2. However, this Court lacks jurisdiction over the issue of whether the location of an individual alien's detention, deportation hearing, or bond hearing results in prejudice to the alien. Issues concerning alleged procedural defects during deportation or bond redetermination proceedings

of individual aliens must first be presented to the Board of Immigration Appeals for adjudication. Thereafter, a final order of deportation by the Board of Immigration Appeals is reviewable in the Court of Appeals under 8 U.S.C. § 1105a(a).

3. This Court lacks jurisdiction to review individual bond determinations made under 8 U.S.C. 1252(a), other than by way of a Petition of Habeas Corpus. 8 U.S.C. § 1105a(a)(9).

4. Venue for this case is proper in this Court.

5. To justify a permanent injunction, plaintiffs must establish actual success on the merits. *Ciba–Geigy Corp. v. Bolar Pharmaceutical Co., Inc.*, 747 F.2d 844, 847–48, 850 (3rd Cir.1984), *cert. denied*, 471 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 696 (1985); *LaDuke v. Nelson*, 762 F.2d 1318, 1330 (9th Cir.1985). Plaintiffs likewise must show that the balance of equities favor injunctive relief. *LaDuke*, 762 F.2d at 1330. To satisfy this standard, plaintiffs must demonstrate the likelihood of substantial and immediate irreparable injury and the inadequacy of remedies at law. *Id.; City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983).

6. Injunctive relief is designed to deter future misdeeds, not to punish for past conduct. *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 62, 95 S.Ct. 2069, 2078, 45 L.Ed.2d 12 (1975); *Dombrowski v. Pfister*, 380 U.S. 479, 485, 85 S.Ct. 1116, 2078, 14 L.Ed.2d 22 (1965). As a matter of law, therefore, plaintiffs could not obtain an injunction as to alleged past violations of their rights. *Loya v. INS*, 583 F.2d 1110, 1114 (9th Cir.1978). The existence of isolated incidents of agency misconduct under valid statutes or policies is not sufficient cause for the issuance of injunctive relief by a federal court. *Allee v. Medrano*, 416 U.S. 802, 815, 94 S.Ct. 2191, 2200, 40 L.Ed.2d 566 (1974). The Supreme Court has held, however, that in certain situations, injunctive relief may be warranted. First, if the agency has adopted a specific policy or practice which is in violation of the constitutional rights of a class of plaintiffs, a federal court may issue an injunction against the particular policy or practice. Second, the Supreme Court in *Medrano*, 416 U.S. at 815, 94 S.Ct. at 2200, stated that where there is a "persistent pattern" of police misconduct, injunctive relief may be appropriate. But, in *Rizzo v. Goode*, 423 U.S. 362, 373–75, 96 S.Ct. 598, 605–06, 46 L.Ed.2d 561 (1976), the Court explained that in *Medrano* and its other decisions, the criterion which warranted injunctive relief was not merely a showing of a pattern of misconduct but also that the misconduct was causally linked to a specific plan or conspiracy of the named defendants. The Supreme Court in *Rizzo* went on to hold that where the evidence failed to show an affirmative link between the various incidents and the adoption of any plan or policy by the named defendants, injunctive relief was not warranted on the theory that there was an unacceptably high number of incidents of constitutional dimension or on the theory that the defendants should be held responsible because of their failure to act in the face of a statistical "pattern" of police misconduct. In sum, to establish entitlement to injunctive relief on the basis of a pattern of past misconduct, a plaintiff must show: (1) a pervasive pattern, (2) a causal linkage between the pattern and a policy of the named defendants, (3) the likelihood of immediate irreparable injury, and (4) inadequate remedies at law. *See Lyons*, 461 U.S. at 111, 103 S.Ct. at 1670; *Rizzo*, 423 U.S. at 375–76, 96 S.Ct. at 6006; *Wong v. Nelson*, 549 F.Supp. 895, 896–97 (D.Colo.1982).

7. The Attorney General has the authority, conferred by statute, to choose the location for detention and to transfer aliens to that location. 8 U.S.C. § 1252(c); *Committee of Central American Refugees v. INS*, 795 F.2d 1434, 1440 (1986), as amended, 807 F.2d 769 (1987); *see also Rios–Berrios v. INS*, 776 F.2d 859, 863 (9th Cir.1985). Such a transfer, standing alone, does not constitute a violation of plaintiffs' due process or statutory rights justifying the issuance of injunctive relief to restrict the Attorney General's discretion under

section 1252(c) of the Immigration and Nationality Act (the Act).

8. The Act provides that an alien in deportation proceedings, wherever detained, has the privilege of being represented by counsel, at no expense to the government. 8 U.S.C. § 1252(b); *see also* 8 U.S.C. § 1362; *Vides–Vides v. INS*, 783 F.2d 1463 (9th Cir.1986). Regulations promulgated pursuant to the Act assure the alien's limited right to counsel, provide that the alien receive notice of this privilege at the commencement of the hearing, and contemplate that the immigration judge continue the hearing to give the alien an opportunity to secure representation. *See* 8 C.F.R. §§ 242.1(c), 242.2(a), 242.10, 242.13, 242.-16(a), and 292.5. The opportunity to be represented has also been held to be grounded in the due process clause of the Fifth Amendment. *Magallanes–Damian v. INS*, 783 F.2d 931, 933 (9th Cir.1986); *Rios–Berrios v. INS*, 776 F.2d 859, 862 (9th Cir.1985).

9. Neither the Constitution nor the Act, however, preclude a deportation hearing from proceeding in the absence of counsel. The Sixth Amendment guarantee of representation, limited by its terms to "criminal prosecutions," has no application to civil deportation proceedings. *Committee of Central American Refugees*, 795 F.2d at 1439; *Martin–Mendoza v. INS*, 499 F.2d 918, 922 (9th Cir.1974), *cert. denied*, 419 U.S. 1113, 95 S.Ct. 789, 42 L.Ed.2d 810 (1975). The Fifth Amendment right to due process is satisfied if the alien has a full and fair hearing, with or without representation. *Ramirez v. INS*, 550 F.2d 560, 563 (9th Cir.1977). If an alien cannot afford counsel and cannot procure *pro bono* representation after a reasonable opportunity, he must represent himself. *See Vides–Vides*, 783 F.2d at 1469. Consequently, although the government may not unreasonably interfere with the alien's representation by counsel, it is under no obligation to insure that all aliens or indigent aliens are represented. *A fortiori*, neither the Constitution nor the Act preclude transfers on the grounds that fewer *pro bono*

counsel are available in the new location for detention.

10. At the outset of trial, the Court granted defendant's motion in limine to exclude any evidence relating to conditions in El Salvador and Guatemala. The level of civil strife, political violence or persecution in a country is irrelevant to the statutory and constitutional procedural rights accorded each alien in deportation proceedings in the United States. Every alien of whatever nationality has the same statutory procedural rights in deportation proceedings, including the opportunity to be represented by counsel and apply for asylum. While the level of violence or level of persecution in a particular country may be germane to the merits of an individual asylum claim, i.e. whether the alien has a "well-founded fear," *see Vides–Vides*, 783 F.2d at 1468–70, the conditions of violence or persecution in a particular country cannot be used to enlarge or diminish the procedural rights of aliens of one nationality as opposed to another. Moreover, the Court lacks any basis to quantify the level of conditions in another country which would justify judicial interference in the Attorney General's exercise of his statutory discretion to detain aliens of a particular nationality as opposed to another. In the absence of a policy which violates the due process or statutory rights of aliens, prudential considerations preclude the Court from exercising its jurisdiction to involve itself in the supervision of the Attorney General's exercise of his discretion to detain aliens. *See Winpisinger v. Watson*, 628 F.2d 133 (D.C.Cir.), *cert. denied*, 446 U.S. 929, 100 S.Ct. 1867, 64 L.Ed.2d 282 (1980); *Committee of Central American Refugees*, 795 F.2d at 1440–41.

11. One exception has warranted judicial interference with the Attorney General's discretion to detain and transfer aliens for detention purposes, that is when transfer interferes with the existence of an established, on-going attorney-client relationship. *See Committee of Central American Refugees v. INS*, 795 F.2d at 1437–1439. Accordingly, in order to prevail on the merits in a class action, plain-

tiffs must establish by a preponderance of the evidence that defendants engage in a pattern or practice which implements an official policy of transferring class members who have established, on-going attorney-client relationships in the San Francisco District. *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). Plaintiffs have failed to carry their burden of proof. The evidence presented demonstrates that the Attorney General's transfer practice is nondiscriminatory and nonpretextual.

■ 12. The evidence presented demonstrates a disparity in the number of lawyers available in El Centro and Florence as opposed to San Francisco. That disparity, however, does not rise to the level of a due process violation in view of the access to counsel that is available in El Centro and Florence, albeit in lesser numbers perhaps than those available in San Francisco. Therefore, there is no need to reach the question of whether a showing of effective denial of access to counsel would justify interference with the Attorney General's discretion to detain aliens given the absence of such evidence in this case.

■ 13. The authority of a district court to wield its equitable powers is limited to the narrow instance in which a program, pattern, or scheme by immigration officials to violate the constitutional rights of aliens has been shown. *See Haitian Refugee Center v. Smith*, 676 F.2d 1023, 1033 (5th Cir.1982), *disapproved on other grounds, sub nom. Jean v. Nelson*, 727 F.2d 957 (11th Cir.1984); *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561. Plaintiffs have not shown that defendants engage in a program, pattern, or scheme to deny members of the plaintiff class the opportunity to secure representation in deportation or related proceedings, to deny plaintiffs the opportunity to present evidence, or to deny plaintiffs the opportunity to apply for asylum. The Act, regulations, and policies of defendants mandate that the alien be given the very rights and opportunities plaintiffs claim will be absent in any hearing conducted in El Centro or Florence. The fact of deportation is not *per se* proof

that hearings resulting in orders of deportation abridge the aliens' rights.

14. This Court has certified this as a class action. Thus, the Court has found that the claims asserted by the named plaintiffs are typical of the class and that the experiences of the named plaintiffs are representative of the class. Fed.R.Civ.P. 23(a)(3). As the Ninth Circuit specifically found in this case, nearly all of the named plaintiffs were shown to have received the assistance of counsel after their transfers and thus have failed to show that they will suffer irreparable injury to a protectible constitutional right or statutory privilege. *Committee of Central American Refugees*, 795 F.2d at 1441–42.

15. Adequate remedies exist at law to address the injury plaintiffs allege. At any point after the institution of deportation proceedings, the alien may move for a change of venue and is not required to appear at a hearing to make such a request. *Matter of Victorino*, Interim Dec. No. 2909 (BIA 1982). An adverse decision would be reviewable on appeal. The Act and regulations provide that any alien present in the United States may apply to the District Director for asylum without regard to his status. 8 U.S.C. § 1158; 8 C.F.R. § 208.1, *et seq.* If the alien applies for asylum after the initiation of deportation proceedings, the alien may also obtain administrative and judicial review of any adverse decision rendered during the deportation hearing. *See* 8 U.S.C. § 1105a(a); *Foti v. INS*, 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963); 8 C.F.R. § 3.1(b)(2). In addition, in the context of petitions for review under section 1105a(a), an alien may raise any other statutory or constitutionally based claim, including claims that he was denied an opportunity to be represented or to present evidence. Finally, even after the entry of a final order of deportation, an alien may still move to reopen deportation proceedings to apply for asylum in the United States. *See* 8 C.F.R. §§ 3.2, 242.22. The denial of the motion to reopen is subject to judicial review as is any final order of deportation.

### Conclusion

In view of the foregoing, defendants' motion to dismiss under Fed.R.Civ.P. 41(b) is granted. Furthermore, judgment is granted to defendants in accordance with the Judgment filed herewith.