Crosby Wilfredo ORANTES–HERNANDEZ, Organizacion De Professionales Y Tecnicos Salvadorenos, Casa El Salvador–Farabundo Marti; Salvadoran American Professional Association; Concilio Manzo; Central American Refugee Program; El Rescate; Marta Ester Paniagua–Vides; Jose Sanchez Flores; Dora Alicia Ayala De Castillo; Adelso Salome Flores; Uvaldo Aguilar; Dora Elia Estrada; Juan Francisco Perez–Cruz; Jose Adilman Barahona; Ana Estela Guevarra–Flores; Maria Elena Molina; Candido Carcamo Marroquin; Delia Elizabeth Garcia–Quintanilla; Marta Osorio; Gloria De Flores; Jose Eduardo Rubio; Jose Francisco Marroquin–Salvador; Hugo Rugamas; Refugiados Uno through Cuatro, inclusive, Plaintiffs,

v.

Edwin MEESE III, Attorney General of the United States; Immigration and Naturalization Service; Harold Ezell, Western Regional Commissioner, Immigration and Naturalization Service, Defendants.

No. CV 82–1107KN.

United States District Court,
C.D. California.

April 29, 1988.

Linton Joaquin, Central American Refugee Center, Charles Wheeler, Nat. Center for Immigrants' Rights, Sandra Pettit, Sheila K. Neville, Immigrants' Rights Office, Legal Aid Foundation of Los Angeles, Mark Rosenbaum, ACLU Foundation of Southern California, Los Angeles, Cal., Paula Pearlman, San Fernando Valley Neighborhood Legal Services, Pacoima, Cal., Vera Weisz, Thomas Edwards, Jeannette E. Stokely, Dan Marmalefsky, Hufstedler, Miller, Carlson & Beardsley, Los Angeles, Cal., Mark Van Der Hout, Miriam Hayward, Nat. Lawyers Guild, Redwood City, Cal., for plaintiffs.

John R. Bolton, Asst. Atty. Gen., Allen W. Hausman, Richard M. Evans, Madelyn E. Johnson, Civil Div., U.S. Dept. of Justice, Washington, D.C., Robert C. Bonner, U.S. Atty., Frederick M. Brosio, Jr., Asst. U.S. Atty., Chief, Civil Div., Ian Fan, Asst. U.S. Atty., Los Angeles, Cal., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW; PERMANENT INJUNCTION

KENYON, District Judge.

The Court, having received and considered the evidence presented, having heard the testimony of witnesses, and having heard the arguments of counsel on August 31, 1987, hereby makes the following Findings of Fact and Conclusions of Law:

### I. FINDINGS OF FACT

A. *The Litigation*

1. The named individual plaintiffs are citizens and natives of El Salvador residing within the United States who have been taken into custody by the Immigration and Naturalization Service (hereinafter "INS" or "Service"). Plaintiffs brought suit on their own behalf and on behalf of all citizens and nationals of El Salvador who have

been or will be taken into custody pursuant to 8 U.S.C. § 1357.

2. With respect to Count VIII of the complaint, plaintiffs also brought suit on behalf of all Salvadorans who, subsequent to June 2, 1980, requested, or will in the future request, political asylum within the United States prior to being served with an Order to Show Cause pursuant to 8 C.F.R. § 242.1, or whose applications for asylum have not or will not be presented to a district director for adjudication in accordance with 8 C.F.R. § 208.8. Because of the pendency of litigation which specifically addresses the issues raised in Count VIII, plaintiffs have presented no evidence on this subject. *Hunter v. INS,* CV 85–4425 JGD (C.D.Cal.8/85). Plaintiffs are therefore deemed to have abandoned this claim.

3. On April 30, 1982, this Court provisionally certified plaintiffs as the representatives of a class consisting of "[a]ll citizens and nationals of El Salvador eligible to apply for political asylum under 8 U.S.C. § 1158 who, (a) have been or will be taken into custody pursuant to 8 U.S.C. § 1357 by agents of the Immigration and Naturalization Service." The class originally certified included a subclass reflecting the claims presented in Count VIII. As this claim has been abandoned, the class certification is modified accordingly.

4. The class in this case is identifiable and includes the plaintiff class representatives. The class is so numerous that joinder is impractical and class certification avoids the need for a multiplicity of actions. The claims of the class representatives and other class members present common questions of law and fact which predominate over any factual questions unique to each individual. The claims of the named plaintiffs are typical of the claims of the class. The named plaintiffs fairly and adequately represent the interests of the class. No notice to the class is required. *Orantes–Hernandez v. Smith,* 541 F.Supp. 351, 370–72 (C.D.Cal.1982).

5. At the time the lawsuit was filed, defendant William French Smith was the duly appointed Attorney General of the United States. He has subsequently been replaced by Edwin R. Meese III, who ac-

cordingly is substituted as defendant in his official capacity. The Attorney General is charged with the administration and enforcement of all laws relating to the immigration, deportation, and naturalization of aliens. 8 U.S.C. § 1103(a). All INS agents, officers and employees act pursuant to a series of delegations of authority vested in the Attorney General.

6. Defendant INS is a federal agency within the United States Department of Justice and is responsible for enforcing the immigration and naturalization laws and for promulgating regulations pursuant thereto.

7. At the time the lawsuit was filed, defendant Edward O'Connor was the duly appointed Western Regional Commissioner of the INS. He has subsequently been replaced by Harold Ezell, who accordingly is substituted as defendant in his official capacity. The Western Regional Commissioner is subject to the supervision and direction of the Commissioner of the INS. He is responsible for directing INS operations in the Western Region, which includes the states of California, Arizona, Nevada, and Hawaii. Defendant Ezell resides in the Central District of California.

**B.** *Conditions in El Salvador and Central America*

8. A substantial number of Salvadorans who flee El Salvador and enter the United States possess good faith claims to asylum pursuant to United States asylum laws and the Refugee Act of 1980.

9. A substantial number of Salvadorans who flee El Salvador possess a well-founded fear of persecution pursuant to United States asylum laws and the Refugee Act of 1980.

10. People from a wide cross-section of Salvadoran society suffer human rights abuses. Trade unionists, members of farmworker unions and cooperatives, religious workers, human rights activists, refugee relief workers, members of student or political organizations, people suspected of opposition to the government or of being sympathetic to the opposition, and family

members and associates of those involved have been particularly subject to abuses.

11. The form of the persecution includes the following: arbitrary arrest, short term detention, torture including use of electric shock, *capucha*, beatings, rape, "disappearance", extra-judicial executions, abductions, threats against family members, intimidation, forced ingestion of food, false imprisonment, mock-executions, sleep deprivation, mass killings, and forced relocations.

12. The persecutors are primarily Salvadoran military and security forces which include the *Policia de Hacienda* (Treasury Police), *Policia Nacional* (National Police), *Guardia Nacional* (National Guard), as well as the paramilitary *Brigadas de Defensa Civil* (Civil Defense Patrols), and the *patrullas contonales* (canton patrols). Guerilla forces have been implicated in extra-judicial executions and abductions.

13. Decree 50 of February 1984 suspends constitutional protections and governs proceedings against those accused of crimes against the state. Decree 50 contains provisions, including a 15-day period of incommunicado detention, which facilitate human rights abuses such as arbitrary arrest and interrogation, threats against the detainee and family members, and "disappearance" and torture. Political prisoners are kept in detention without trial for periods of up to five years, and without the protection of due process rights.

14. The Salvadoran judicial system completely fails to investigate and punish violations of human rights. There has never been a successful prosecution and conviction of any member of the Salvadoran security forces for political violence and human rights abuses against civilians, except where the victims have included U.S. citizens and only then after extensive involvement and intervention by the United States government. United States Justice and State Department officials concur in this judgment.

15. The judicial system fails to function despite asserted government efforts including those of President Duarte and the United States Justice and State Departments. It is not foreseeable that the judicial sys-

tem will function to redress acts of political violence and human rights abuses against Salvadoran civilians.

16. Major human rights organizations including Amnesty International, as well as the United Nations and the Organization of American States have repeatedly condemned human rights abuses occurring systematically in El Salvador. El Salvador is one of five countries where the United Nations has established a procedure for particularized reporting on human rights violations.

17. A substantial number of Salvadorans currently and since 1979 flee persecution based on the expression of political opinion through participation in union activities and organizational membership. Many flee because of persecution resulting from their activities on behalf of the poor or displaced through their work with humanitarian or religious organizations.

18. Salvadorans flee to the United States because of persecution by the government based on a political opinion which the government and/or security forces impute to them. Many Salvadorans are persecuted because the government considers them subversive. Many of those Salvadorans who attempt to remain neutral in the civil conflict are persecuted by either the government or insurgent forces based upon this expression of neutrality and as a consequence flee the country.

19. Human rights abuses and political violence by the military and security forces in El Salvador against the civilian population have prevailed since the outbreak of the civil conflict in the late 1970's and continue to the present. Human rights monitors estimate that approximately 45,000 innocent Salvadoran civilians, of an overall population of about five million, have been murdered since 1979, for the most part by the military in combat or by security forces and death squads. An additional 4,000 civilians have been reported as "disappeared." Detentions of civilians by security forces on alleged political grounds approximated 3,000 in 1985 and were on the rise by the end of 1986. While the number of political killings has decreased

since the height of the terror in 1980–82, the present level of violence is sufficient to maintain the terror and keep the populace psychologically subjugated. Additionally, arbitrary detentions, arrests, intimidation, and torture of political prisoners continue. While the United States Government alleges that it has made efforts to halt these abuses, little has been accomplished.

20. The security forces operate and have been permitted to operate in El Salvador to a great degree without legal restraint, and the judicial system is incapable of providing protection to victims or potential victims of human rights abuses.

21. Salvadoran civilians in the countryside are subjected to repeated bombing attacks and ground sweeps by the military. These come about not only in the normal course of a war, but in many cases are brought about because the government has imputed political opinion to the victims based solely on their residence. Many civilians have been forcibly relocated by the military and 68% of El Salvador's displaced fled their homes out of fear of repression from the armed forces or paramilitary groups. Displaced civilians who attempt to return to their homes or re-populate the countryside are harassed and persecuted by military authorities.

22. In 1986, President Reagan designated 3000 available admissions for Latin American refugees through the overseas refugee processing program, and named Cuba the only country in Latin America as a "country of special humanitarian concern," thus making it the only country eligible for these admissions. El Salvador has never been designated as a country of special humanitarian concern; thus, there is no overseas refugee processing available for Salvadorans to legally enter the United States as refugees.

23. Mexico is not a signatory to the 1951 Convention or the 1967 Protocol Related to the Status of Refugees. Salvadorans are not recognized as "classical" refugees in Mexico, and there is no assistance program for Salvadorans in that country. Salvadorans have no legal status in Mexico outside of a small number who have gained political asylum or some who have student visas or work permits. Those without special status cannot work and are routinely subject to extortion and other abuses because of their illegal status. There have been numerous accounts of women being apprehended and raped by uniformed men, as well as accounts of Salvadorans being robbed by police as they pass through Mexico.

24. Honduras is not a party to the 1951 Convention or the 1967 Protocol Relating to the Status of Refugees. All refugees are considered to be residing in Honduras temporarily, and their status does not generally permit them to move freely or to work. The Salvadoran refugee camps in Honduras are closed camps, without freedom of movement. There is a military presence near all camps and searches occur frequently. On August 29, 1985, the Honduran army raided Colomoncagua refugee camp. The United Nations Human Rights Commission confirmed that two people, including an infant, were killed and that 28 were wounded.

25. Salvadoran refugees voluntarily returning to El Salvador from camps in Honduras have been detained and imprisoned by Salvadoran authorities based on their suspected political opinions and activities of several years previously, prior to repatriation.

26. Costa Rica is a party to the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees. Very few Salvadorans have entered Costa Rica since 1982, however, because it has become virtually impossible for Salvadorans to cross into Nicaragua or Honduras; if they do reach Nicaragua, they have to cross into Costa Rica through areas of combat.

C. *INS Processing of Detained Salvadorans*

27. In fiscal year 1986, according to INS statistics, the INS apprehended 1.8 million illegal aliens in the United States. The Border Patrol accounted for 94% of the total apprehensions. Mexican nationals accounted for 94% of the illegal aliens arrested while Salvadorans comprised 1.1% of the total INS apprehensions in 1986.

28. INS has made no systematic study or undertaking to determine why Salvadorans have left El Salvador since 1979 and why those who did leave came to the United States.

29. After aliens are apprehended, they are processed by either border patrol agents or INS officers. INS processing of detained aliens consists of an interrogation combined with the completion of various forms, including form I–213, "Record of Deportable Alien," and the presentation of form I–274 (formerly I–274A for class members), "Request for Voluntary Departure." Significant differences exist in the processing routines of various border patrol agents and INS officers.

30. Although plaintiffs and the class they represent are eligible to apply for political asylum and to request a deportation hearing prior to their departure from the United States, 8 U.S.C. §§ 1158, 1252(b), 1253(h), the vast majority of Salvadorans apprehended sign voluntary departure agreements which commence a summary removal process. 8 U.S.C. § 1252(b).

31. Once a class member signs for voluntary departure in the course of INS processing, he or she is subject to removal from the United States as soon as transportation can be arranged, unless for some reason voluntary departure is revoked. A class member given administrative voluntary departure in this manner never has a deportation hearing, the only forum before which the detained class member could seek political asylum, 8 U.S.C. §§ 1158, 1101(A)(42), and mandatory withholding of deportation. 8 U.S.C. § 1253(h).

32. The widespread acceptance of voluntary departure is due in large part to the coercive effects of the practices and procedures employed by INS and the unfamiliarity of most Salvadorans with their rights under United States immigration laws.

33. Prior to the issuance of the preliminary injunction in this case, INS agents directed, intimidated, or otherwise coerced Salvadorans within their custody, who had not expressed a desire to return to El Salvador, to sign form I–274A for voluntary departure. INS agents used a variety of techniques to procure voluntary departure, ranging from subtle persuasion to outright threats and misrepresentations. Many class members were intimidated or coerced to accept voluntary departure even when they had unequivocally expressed a fear of returning to El Salvador.

34. Even when a class member refuses to sign form I–214, "Waiver of Rights," INS officers consider that they may present the person with the voluntary departure form.

35. These practices of coercion typically were experienced or witnessed by the class members who testified, and also by other class members who were present. The widespread nature of these practices was such that, prior to the issuance of the injunction, a substantial number of Salvadorans arrested and processed by the INS signed for voluntary departure irrespective of their fears of returning to El Salvador.

36. Prior to the injunction, INS as a practice did not permit many class members to read form I–274A nor were its contents otherwise communicated to them before signing.

37. Both before and after the issuance of the injunction, INS processing officers engaged in a pattern and practice of misrepresenting the meaning of political asylum and of giving improper and incomplete legal advice which denied class members meaningful understanding of the options presented and discouraged them from exercising available rights. INS officers and agents routinely advise Salvadorans of the negative aspects of choosing a deportation hearing without informing them of the positive options that are available. This practice serves no legitimate government purpose.

38. Without informing them that voluntary departure can be requested at a deportation hearing, INS officers advise detainees that if they do not sign for voluntary departure they could be formally deported from the United States, and that such a deportation will preclude their legal re-entry without the pardon of the Attorney General.

39. INS officers and agents routinely tell class members that if they apply for

asylum they will remain in detention for a long time, without mentioning the possibility of release on bond. Similarly, without advising that the amount of bond can be lowered by an immigration judge and that there are bond agencies which can provide assistance, INS agents regularly tell class members that if they do not sign for voluntary departure they will remain detained until bond is posted. Some agents tell class members the monetary amount of bond they can expect or the amount of bond given to other Salvadorans, without telling them that the bond amount ultimately depends upon the circumstances of the individual class member.

40. INS officers commonly tell class members that if they apply for asylum it will be denied, or that Salvadorans do not get asylum. INS officers and agents represent that Salvadorans ultimately will be deported regardless of the asylum application. INS officers and agents misrepresent the eligibility for asylum by saying that it is only given to guerillas or to soldiers.

41. INS processing agents or officers further discourage class members from applying for asylum by telling them that the information on the application will be sent to El Salvador, and stating that asylum applicants will never be able to return to El Salvador.

42. INS processing officers have used the threat of transfer to remote locations as a means of discouraging detained class members from exercising their rights to a hearing and to pursuing asylum claims.

43. Prior to the issuance of the injunction, INS agents often did not allow Salvadorans to consult with counsel prior to signing the voluntary departure forms, although they acknowledged that aliens have this right. INS officers may present form I–274 even when the class member has requested and been denied the use of a telephone to call an attorney. Even those Salvadorans fortunate enough to secure legal representation were often unable to avoid voluntary departure, as INS' practice was to refuse to recognize the authority of counsel until a formal notice of representation (Form G–28) was filed. Due to the rapid processing of Salvadoran detainees, it was often physically impossible for counsel to locate their clients and file Form G–28 before the client was removed from the country.

44. Prior to the injunction, INS often refused to recognize counsel's authority to revoke voluntary departure agreements on behalf of their clients, even after a Form G–28 was filed. Realistically, the detainees were unable to revoke the voluntary departure agreements on their own, due to the cumulative effect of the INS practices and procedures discussed herein. Additionally, many Salvadorans were not informed of or did not understand the revocability of the agreements.

45. The foregoing practices serve no legitimate government purpose, and were executed deliberately or with knowledge or with reason to believe that they will effectively discourage class members from applying for asylum or otherwise electing not to return to El Salvador.

46. INS was aware of these and similar practices and took no corrective action. For example, as set forth in a memorandum to all district directors and chief patrol agents in the Western Region, the INS Associate Regional Commissioner for Enforcement in the region recognized that INS agents in the field were instructing other-than-Mexican (OTM) aliens who specifically requested political asylum to sign form I–274A, ignoring the request of the alien. [Pls.Ex. 343.] This memorandum was received by the the Chief Patrol Agent for the El Centro sector of the Border Patrol but no investigation ensued.

47. INS practices and procedures have not adapted sufficiently in response to the preliminary injunction to preclude the necessity for permanent injunctive relief. INS agents continue to discourage class members from pursuing asylum claims, while counseling them to accept voluntary departure. This Court's Order was not diligently respected, nor were agents disciplined for failing to adhere to its terms.

48. The Court notes that INS has addressed the problems of misinformation and inconsistent information in certain respects. Specifically, at the El Centro and

Oakdale detention centers, INS has developed videos to provide information to detainees. These videos describe the general procedures at the facility and provide information on deportation procedures, political asylum applications and bond. Those INS officials who testified confirmed the value of these videos as providing helpful, consistent information to detainees. Providing such videos at each detention center would be in the interest of INS and the detained class members, and the Court strongly recommends that such videos be developed and utilized.

49. INS has no definitive policy or training as to the method used in presenting the offer of voluntary departure to a detainee. There is no restriction as to what the agent may say to the alien in defining voluntary return. There is also no policy precluding an officer from asking an alien about voluntary departure repeatedly during the processing session.

50. INS procedures for processing Salvadorans are not uniform, are not designed to and do not in fact identify Salvadorans who have a well-founded fear of persecution, and are not reasonably calculated to protect class members' rights.

51. INS does not require that processing officers and agents question detained Salvadorans as to why they left their country. Where this information is provided by the detainee, there is no requirement that it be noted on form I–213. Even when Salvadorans inform the processing agent that they have received death threats or have had relatives killed in their country or otherwise express indicia of a well-founded fear, this information need not be and is not routinely noted by the processing agent.

52. The effects of the practices described above are compounded by the fact that INS processing of detained class members takes place under conditions which are inherently coercive and often deliberately intimidating. Salvadorans are often questioned immediately following their arrests, which in many cases is only shortly after they entered this country. In many cases, at the time of processing, class members have not recovered from the trauma of experiences suffered in El Salvador and during their journeys through Central America. Many have gone without sleep and food for substantial periods of time. In addition, processing is usually conducted by armed and uniformed Border Patrol agents, which contributes to a coercive atmosphere. Furthermore, Salvadoran detainees are generally not familiar with United States institutions and laws regarding immigration.

53. The evidence before the Court indicates that the foregoing practices were and continue to be widespread, not isolated or sporadic.

54. INS failed to investigate class members' allegations of coercion, discouragement and misconduct by INS officers and agents in processing and detention with the exception of one inadequate investigation in the case of a named plaintiff.

55. INS was aware of problems and practices of INS personnel which interfere with class members' access to courts and right to counsel, but failed to take adequate or in many instances any disciplinary or corrective action.

56. INS does not provide any procedure whereby class members can effectively register complaints or have corrective action taken regarding allegations of misconduct by INS personnel.

57. The procedures used by the INS in implementing the administrative voluntary departure procedure for Salvadorans are highly likely to result and have resulted in class members being deprived of their rights to a deportation hearing, to apply for voluntary departure, and to have deportation withheld, although the class members have and would wish to pursue valid claims to asylum and withholding of deportation.

58. The impressions of INS agents and officials that Salvadorans come to the United States solely for economic gain reflect a lack of sensitivity and understanding and derive from ignorance on the part of INS agents as to the complex motivations and situations of those who have fled El Salvador. These impressions further reflect the limitations of INS' processing system and training. Even well-intentioned INS

agents are frequently unable to break down the barriers which exist between the agents and the detainees in order to elicit accurate and complete information.

59. Many Salvadorans, particularly class members fleeing persecution by authorities, react to INS arrest by being outwardly humble and passive in the face of authority, and are vulnerable to pressure at the time of arrest and processing. Salvadorans who have been persecuted by soldiers or guerillas in El Salvador do not feel comfortable confiding in a uniformed officer of the United States. This is particularly true because these detainees are aware that the United States supports the Salvadoran government, which tolerates and participates in acts of terror.

60. Many Salvadorans are extremely reluctant to communicate their traumatic or difficult experiences in El Salvador. This reluctance is based in part on a psychological response to the trauma they experienced or the shame or guilt many feel as a result of surviving and abandoning their country and their families. INS is specifically aware of this reluctance but has not undertaken any efforts to compensate for its effects on the ability of Salvadorans to make meaningful choices in processing.

61. Many Salvadorans are also reluctant to communicate what happened to them in El Salvador because they fear that the information could be used against them or that revealing the information might endanger family and friends who remain in El Salvador. INS at no time undertakes any efforts to relieve Salvadorans of these concerns.

62. Salvadorans will frequently explain to INS agents and others who interrogate them as to why they left El Salvador that they left "por la situacion" (because of the situation). This phrase is used by Salvadorans to cover the entire civil war including the violence and disruption of normal life. Salvadorans will use this term and other euphemisms to lessen the emotional impact and intensification of feelings which occur if they speak directly about El Salvador. Upon the expression of the phrase and similar euphemisms, INS agents make no further inquiry and routinely interpret this expression as meaning that class members fled solely for economic reasons.

63. Many Salvadorans will only relate the totality of what happened to them in El Salvador to someone with whom they have established a relationship of trust and confidence. They are most likely to be open and forthcoming with an individual who is not connected with the government or does not represent authority but rather appears to represent a relief or advocacy organization, although they may tell their fears to any person who demonstrates the strength and sensitivity to handle the information. INS is aware of this problem but has made no meaningful effort to train processing agents to deal with it, although some INS officials have managed to develop open and honest relationships with class members. These officials confirm the class members' stories of terror.

64. Based upon the foregoing, it cannot be assumed that Salvadoran detainees who fear return to El Salvador will disclose this fear to INS and Border Patrol officials. *Contra, Ramirez–Osorio v. INS,* 745 F.2d 937, 944 (5th Cir.) ("[I]t is not unreasonable to assume that persons who fear return to their country will say so."), *reh'g denied,* 751 F.2d 383 (1984) (en banc).

65. Despite the issuance of the preliminary injunction and the procedural changes made by INS as a consequence thereof, the INS continues to process class members and present them with voluntary departure at locations where telephones are unavailable to them.

66. INS processing officers directly discourage class members from seeking legal assistance and deny them access to telephones until after processing.

### D. *Provision of Legal Services Lists*

67. INS distributes legal services lists that contain inaccurate, incomplete or non-serviceable telephone numbers, no telephone numbers at all, and inaccurate addresses for legal services agencies. It lists without qualification agencies that do not accept collect calls or do not represent detainees, persons in deportation proceedings, asylum-seekers or Central Americans. It

lists agencies that accept no immigration cases at all, do not offer free legal services, do not have Spanish-speakers available, and do not represent persons in the geographical area in which the list is distributed. It lists agencies which no longer exist, which are no longer accredited to represent persons in immigration proceedings, or which have sought unsuccessfully to be removed from the list. INS has refused to list a free legal services agency with the annotation that it serves only Central Americans, and listed another as one that charges a nominal fee even though it charges no fees at all.

68. INS distributes legal services lists that fail to include agencies that provide free or low-cost representation to detained Central Americans seeking asylum, and has unreasonably refused to act upon or grant applications from such agencies to be included in these lists or to entertain suggestions from them on how to provide a more comprehensive list. Cooperating with local attorneys and agencies about maintaining the list or assisting an agency that wants to be placed on the list would not significantly burden INS.

69. While the legal services lists are of critical importance, they are of no value if they contain incorrect information. Inaccurate or incomplete lists frustrate the purposes of INS regulations and of this Court's injunction by failing to give aliens in deportation proceedings access to agencies that provide free or low-cost immigration representation. The inability to obtain legal assistance because of inaccurate legal services lists creates frustration among Salvadorans. It would not place a significant burden on the INS to routinely revise, update, and distribute an accurate legal services list.

70. INS has acted in bad faith by failing to make prompt and adequate revisions when notified of errors and omissions in the legal services lists. INS has consistently failed to discipline any of its officers for failing to comply with court orders in distributing accurate legal services lists.

71. Legal services lists are not always provided, or even available, to Salvadorans during processing. The lists are some-

times provided to class members only upon request.

72. INS routinely fails to make legal services lists available to aliens at its detention centers, including aliens who have been transferred to detention facilities from distant locations and who have only received lists specific to the locations where they were apprehended. Detention service officers do not provide the lists to class members, even when they express fear of returning to their country, unless the class members specifically request the list.

73. INS acted in bad faith when it failed to post legal services lists at the Port Isabel Service Processing Center ("SPC") until INS personnel were deposed by plaintiffs, even though it would have posed no hardship to post the lists earlier.

### E. Notification of Rights

74. Most Salvadorans do not know of the right to seek asylum before they come to the United States. Many who have heard of the term "political asylum" have serious misconceptions about it. Most class members are unfamiliar with the United States legal system and institutions. Many class members are uneducated.

75. Before the issuance of the injunction in this case, INS processing officers would not advise detained Salvadorans of the availability of political asylum, even when the Salvadorans requested an opportunity to apply for asylum, recounted experiences suggesting their eligibility for asylum, or stated that they feared return to El Salvador. Even where Salvadorans had independent knowledge of available alternatives, many agents persisted in their attempts to secure voluntary departure.

76. The provision of the so-called "Orantes advisal" has served to protect the rights of class members. Many class members learned of political asylum only as a result of having been given the advisal.

77. Providing the advisal of rights at the moment of processing would lessen the confusion and anxiety of detained Salvadorans and help them cope with the experience of being detained.

78. After the issuance of the injunction, many class members were nonetheless pro-

cessed by INS without having been provided the advisal.

79. Even where Salvadorans are automatically processed for a hearing, the failure to give an advisal of the right to seek asylum presents a substantial likelihood that class members will be erroneously deprived of this right. It is clear that, absent a requirement that such an advisal be given, the INS will not notify Salvadorans of the right to seek asylum even when they indicate that they are afraid to return to El Salvador. In general, the immigration court will notify a detainee of the right to asylum only when the alien declines to designate a country of deportation. 8 C.F.R. § 242.17(c) (1982); *Duran v. INS,* 756 F.2d 1338 (9th Cir.1985); *Ramirez–Osorio,* 745 F.2d at 941. The evidence indicates that immigration courts have failed to notify Salvadorans of the right to asylum, even where the class member sought to designate another country of deportation.

80. Moreover, uncontradicted evidence established that, at least in some immigration courts, immigration court procedures do not safeguard the rights of unrepresented class members. For example, uncontradicted evidence showed that such proceedings may not always be fully translated in Los Angeles. It further showed that non-English speaking detainees unrepresented by counsel often have virtually no understanding of these proceedings.

81. The language used in the current advisal is too complicated for many Salvadorans to comprehend. Providing separate advisal of rights forms which contain duplicative information creates confusion for class members, unnecessary work for agents, and serves no legitimate government objective. The government has undertaken no efforts to consolidate or simplify the advisals. It is in the government's interest that class members meaningfully understand their rights and make knowing, intelligent and voluntary choices. A modification of the present advisal by using simpler language, simpler sentence structure, and accent marks would make it more comprehensible. The language used in the modified advisal proposed by plaintiffs [Pls.Ex. 374] has a higher level of comprehensibility for class members. Using this modified advisal or a similar modification would reduce confusion for class members and not impose a substantial burden on INS.

## F. *INS Training and Discipline*

82. In all phases of training offered by the Immigration Service or the Border Patrol, INS fails to properly instruct its agents and officers about the contents of the preliminary injunction or how to comply with it when processing class members.

83. INS processing agents and detention officers are not adequately trained to respect the rights of class members. There is no comprehensive nationwide post-academy training to implement the preliminary injunction. INS provides no training to its officers or agents on how to respond to or record class members' statements suggesting an asylum claim. The Border Patrol Academy provides no instruction on how to respond to questions posed by apprehended aliens during processing or how to explain the different rights and options on the voluntary departure form. INS provides no training to immigration detention officers, detention service officers, or contract guards about how to respond to detained aliens who indicate that they are afraid of returning to their country or that they are being wrongfully deported. Immigration detention officers are not adequately trained to respond appropriately to questions from detainees about the status of their cases.

84. INS created the position of detention service officer ("DSO") with the expectation that these officers would serve as a liason between the detainees and the Service and as a source of critical information for detainees about their immigration cases. INS requires that DSOs wear civilian clothing to more easily gain the confidence of the detainees. DSO training was not designed to adequately meet the expectations of the position. Merely training DSOs to be "open, frank and honest" without providing any training on critical issues such as asylum, voluntary departure, and bond determination results in DSOs providing detainees with uninformed, one-sided and distorted answers to their questions.

85. Furthermore, DSOs are not always selected on the basis of their qualifications for this position. Often, they volunteer for this position or are appointed by their supervisors. Some INS officials who become DSOs are very sensitive, and appropriately and effectively carry out their responsibilities. Others use their position to exercise their will over detained class members. INS procedures should be more carefully designed to choose those individuals most qualified to meet the demands of this position.

86. INS provides inadequate training to its officers and agents on asylum law, processing or completing an asylum application, the meaning of political violence or human rights, and the cultural characteristics of Salvadorans.

### G. INS Transfer Policy

87. INS knowingly locates its major detention facilities in communities with little or no legal representation available to indigent detainees. There are few, if any, attorneys to represent indigent class members at El Centro, California; El Paso, Texas; Florence, Arizona; Las Vegas, Nevada; Los Fresnos, Texas; and Oakdale, Louisiana. The availability of legal representation is not a significant criterion in determining where to locate detention facilities. INS considers the American Correctional Association standards, which provide that in locating new facilities an important consideration is that "[t]he facility is geographically accessible to criminal justice agencies, community agencies and inmate lawyers, families and friends," to be inapplicable to the Service.

88. INS follows a general practice of transferring detained class members from the place of arrest to detention centers located in remote and isolated areas. Salvadorans are one of the nationalities which were identified by the INS as "long-term detainees," and are frequently singled out for transfer to distant facilities. INS makes a determination that Salvadorans are long-term detainees even though the average length of stay for Salvadorans at the El Centro detention center is only 11–12 days.

89. INS routinely transfers detained class members from areas where they are represented by counsel. In some locations, transfer is made without making any effort to determine whether the detainee is represented or has a pending request for a bond redetermination proceeding.

90. Class members, where transferred, have been deprived of food and kept incommunicado for extended periods of time. It is common that INS deprives class members of address books and telephone numbers in the course of transfer, such that transfer serves to place them completely out of touch with friends and relatives who could assist them.

91. Transfer to isolated detention facilities results in several forms of prejudice to class members. It frequently prevents class members from obtaining legal representation in their cases. Class members who are unrepresented at their deportation hearings, and who lack an understanding of the procedures, are seriously prejudiced.

92. Transfer also makes bond reduction more difficult to obtain because it removes detainees from their families and friends. The extent of a detainee's attachment to the community, which is diminished by transfer, is a factor considered in setting bond.

93. Class members who have secured counsel are also frequently prejudiced by transfer. Pro bono attorneys often cannot afford to travel to remote facilities to meet with clients or attend hearings.

94. INS routinely does not notify attorneys that their clients have been transferred. Transfers create the additional prejudice of preventing attorneys from meeting with and preparing their client's cases.

95. INS transfer practices have the effect of coercing or otherwise discouraging Salvadorans from exercising their rights to seek political asylum, to withholding of deportation and to the assistance of counsel.

### H. INS Treatment of Detained Salvadorans

96. Salvadorans detained and held by INS in various locations throughout the

United States are regularly subjected to pressure and intimidation from Immigration Detention Officers ("IDOs") to return to El Salvador through deportation or voluntary departure.

97. Pressure by individual IDOs upon Salvadorans to return to El Salvador is augmented by the orientation presentation made by DSOs to newly arrived Salvadoran and Guatemalan detainees at Port Isabel, who are isolated and quarantined until they have had a medical examination. They are segregated from the regular detainee population in Building 39 where they receive an orientation. The focus of the orientation is to encourage detained Salvadorans and Guatemalans to return to their homeland, either by voluntary departure or voluntary deportation. Salvadorans are told by the DSOs that they should sign for their return to El Salvador; otherwise, they will remain in detention for a long time and ultimately be deported.

98. Salvadorans detained in the Arizona district by INS are regularly pressured to return to El Salvador. At the Florence SPC the Service permitted and ratified the conduct of an IDO who for more than a year used threats, intimidation, deceit and misrepresentation to pressure detained Central Americans to return to their countries.

99. Since the issuance of the preliminary injunction in this case, the Service has implemented a policy of encouraging individuals in detention to elect voluntary departure through the practice of making daily announcements of the availability of voluntary departure to detainees in an effort to reduce the detainee population. INS instructs immigration detention officers to encourage detainees to elect voluntary departure as a cost-saving measure.

100. The practice of giving daily announcements of the availability of voluntary departure to detained Salvadorans, without also notifying them of other available rights and privileges they may enjoy under the Immigration and Nationality Act, has a coercive effect and contributes to Salvadorans' submitting to INS pressure to return to El Salvador. INS post-processing practices and procedures do not alleviate the effects of the discouragement and coercion of the arrest and processing, but rather reinforce and exacerbate those effects.

101. Informing Salvadorans that they may revoke decisions made during processing is not sufficient to render the initial decision voluntary and knowing and is insufficient to alleviate the effects of the discouragement and coercion.

102. The limited daytime attorney visitation hours at several detention centers and the long delays in bringing detainees to interview rooms severely limit the ability of attorneys and paralegals to conduct interviews with their clients. Limitations on visiting hours at Los Fresnos and El Centro violate the intent of the court orders applicable to those locations. The system used at several detention centers is insufficient to adequately apprise detainees of the presence of their attorneys.

103. Defendants have made inadequate efforts to ensure the privacy of attorney-client interviews at most detention centers. At no Service detention facility is there adequate privacy for telephone conversations.

104. Members of the public have been denied access to the immigration courts at the Houston and El Centro detention facilities despite the requirements of 8 C.F.R. § 242.16(a) (1987).

105. Despite the requirements of the injunction in *Nunez v. Boldin*, 537 F.Supp. 578 (S.D.Tex.), *appeal dismissed*, 692 F.2d 755 (5th Cir.1982), and the Service Operational Manual, there is no meaningful access to basic written legal rights materials by persons detained at any of the INS detention facilities.

106. INS acted in bad faith by failing to respond to offers to provide, at no cost to the government, legal rights materials in Spanish to be placed in the libraries in several detention centers. Some legal rights materials and legal forms provided to detainees by their lawyers and organizations which represent detainees have been confiscated by INS officials. Non-legal reading materials have also been confiscated. This practice serves no legitimate government purpose, and it would work no

hardship on INS to have self-help materials available. The provision of self-help materials would meet the stated goals of INS for detention centers.

107. Neither Service Processing Centers nor contract detention facilities have comprehensive law libraries, either in English or Spanish.

108. The availability of writing materials for use by detainees varies according to the facility. At Chula Vista, Yuma and Seattle, there is a complete ban on writing materials. At El Centro, until the summer of 1986, the number of pencils and the times of day during which they could be used was severely restricted. At Los Fresnos, pencils and papers were not always made available upon request. At Port Isabel, the court order in *Nunez v. Boldin* ensuring that detainees were not to be deprived of writing materials has been violated. Detainees were deprived of writing materials at the INS facility during general searches of the barracks, when pens, pencils and papers were confiscated and not returned. At Florence, writing materials are sometimes unavailable. In Pasadena, Inglewood and Wenatchee, detainees had unrestricted access to writing materials.

109. Writing materials are necessary to revoke voluntary departures, fill out political asylum applications and appeals, record telephone numbers of attorneys and relatives, and communicate with relatives and friends on the outside.

110. Where writing materials have been freely made available to detainees, it has not created a significant burden for the government.

111. There is a lack of adequate general libraries at the long-term detention facilities. Providing such facilities would not substantially burden INS since the Service in the past has been able to obtain books and staff the libraries in some facilities at little or no cost.

112. Due to time restrictions, the number of functioning telephones, and/or restrictive INS procedures, detainee access to telephones is severely limited in detention centers at Los Fresnos, Chula Vista, Tuscon, Florence, Las Vegas, Los Angeles, La Tuna and Yuma. Detained Salvadorans experience difficulty in reaching attorneys and relatives when using a "collect only" telephone. The system of informing detainees of attorneys' telephone calls is not always reliable.

113. Prior to the entry of the preliminary injunction, detainees facing solitary confinement for disciplinary purposes in the El Centro and El Paso Service Processing Centers did not receive advance notice of the charges, the opportunity to present oral testimony at a hearing, the opportunity to confront and cross-examine adverse witnesses, or the opportunity to be represented by counsel or counsel substitute. The policy at El Centro was to segregate detainees for up to seventy-two hours without a hearing; furthermore, detainees could be segregated repeatedly without a hearing. This policy was only changed in response to the preliminary injunction.

114. Defendants have continued to place members in solitary confinement without a hearing under the guise of administrative segregation. Under this category, detainees at several detention centers can be segregated indefinitely without a hearing. There is no consensus among INS supervisory personnel at the different detention centers and with Mr. Schmidt, author of the INS policy on disciplinary procedures, as to the meaning of administrative segregation and what differentiates it from disciplinary segregation. The conditions of detention and the physical treatment of detainees segregated under the "administrative" procedure and those segregated under the "disciplinary" procedure are substantially the same.

115. Administrative segregation has been used by defendants to circumvent the portion of the preliminary injunction that provides procedural protections for class members placed in solitary confinement for punitive reasons.

116. INS discriminates against Salvadoran asylum applicants by imposing a higher burden of proof, and the low approval rate of Salvadoran asylum claims is the direct result of this discrimination.

117. The Justice Department routinely differentiates among nationalities in the

immigration area, for example, in the use of special processing procedures for Mexican nationals; in grants of extended voluntary departure status to particular nationalities; and in the designation of nationalities to be subject to "immediate action procedure."

118. The following Conclusions of Law, insofar as they may be considered Findings of Fact, are so found by this Court to be true in all respects.

## II. CONCLUSIONS OF LAW

### A. *Jurisdiction and Related Matters*

1. This action is properly maintained as a class action. *Orantes–Hernandez,* 541 F.Supp. at 366–372.

2. Venue is properly placed in this court.

■ 3. This Court has subject matter jurisdiction to resolve the issues raised by plaintiffs' challenges to INS procedures which result in Salvadorans foregoing their rights to apply for political asylum and relief from deportation and to be free from coercion in exercising their rights to raise these claims in deportation proceedings. The Court's jurisdiction extends over plaintiffs' challenge to INS' use of coercive tactics to cause class members to accept voluntary departure to El Salvador, INS' failure to advise class members of the right to apply for asylum, and INS procedures which deprive detained class members who are pursuing asylum claims of effective assistance of counsel. These claims do not assert irregularities in individual deportation hearings, but rather a pattern and practice by immigration officers to violate the constitutional and statutory rights of a class of aliens. *Jean v. Nelson,* 727 F.2d 957, 980 (11th Cir.) (en banc), *reh'g denied,* 733 F.2d 908 (1984), *aff'd on other grounds,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985); *Haitian Refugee Center v. Smith,* 676 F.2d 1023, 1033 (5th Cir. Unit B 1982) (hereinafter *"HRC v. Smith"*), *overruled on other grounds, Jean v. Nelson,* 727 F.2d 957 (11th Cir. 1984); *Orantes–Hernandez,* 541 F.Supp. at 364. To require plaintiffs to raise claims relating to transfer of class members after arrest, inadequate access to counsel and

lack of notice of asylum in deportation proceedings would effectively ensure that some class members would never be able to raise the claims or secure redress. *Id.* at 364.

■ 4. The political question doctrine does not divest this Court of its jurisdiction over plaintiffs' claim that they are entitled to notice of the right to apply for asylum. *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The Court clearly has jurisdiction to determine whether INS is complying with the Constitution and the laws of the United States. *Orantes–Hernandez,* 541 F.Supp. at 365 and cases cited therein. Although the Executive and Legislative branches have the power to make foreign policy determinations, it is the responsibility of this Court to ensure that the due process rights of persons within the United States are respected. Furthermore, a finding that notice of asylum is required is not a determination of the merits of Salvadorans' asylum petitions, nor a suggestion that these petitions should receive special consideration. *Id.*

5. In evaluating plaintiffs' due process claim to notice of the right to seek political asylum, the Court possesses jurisdiction and can evaluate evidence as to the levels of political violence in El Salvador. *See Matthews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Courts routinely consider evidence of overall political violence and human rights abuses in foreign countries in the adjudication of asylum claims, *Mendez–Efrain v. INS,* 813 F.2d 279, 282 (9th Cir.1987); *Bolanos–Hernandez v. INS,* 767 F.2d 1277, 1284 (9th Cir.1984), and in the adjudication of requests for extradition of foreign nationals, *Quinn v. Robinson,* 783 F.2d 776, 788 (9th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986). In this case, such evidence is particularly important in determining the interest affected by any deprivation of rights, as required by the *Matthews v. Eldridge* balancing test. 424 U.S. at 335, 96 S.Ct. at 903. This evidence is also relevant to show the scope of evidence available to support plaintiffs' asylum claims and corroborate their allega-

tions that the implementation of the voluntary departure mechanism makes it impossible for them to submit their claims. *See HRC v. Smith,* 676 F.2d at 1042.

6. Plaintiffs have standing under Article III of the Constitution in that they have demonstrated that they have suffered an actual or threatened injury as a result of defendants' illegal conduct which is likely to be redressed by a favorable decision from this Court. *LaDuke v. Nelson,* 762 F.2d 1318, 1323 (9th Cir.1985), *modified* 796 F.2d 309 (1986).

7. Plaintiffs have satisfied the additional standing requirement, applicable where injunctive relief is sought, that a credible threat of recurrent injury be adduced. *Kolender v. Lawson,* 461 U.S. 352, 355 at n. 3, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *LaDuke v. Nelson,* 762 F.2d at 1326. The four factors set forth in *LaDuke* indicate that plaintiffs have a sufficient "personal stake" under Article III to warrant prospective relief. 762 F.2d at 1324–25. Plaintiffs have shown a significant likelihood of recurrence of the unlawful practices of defendants. Despite the issuance of the preliminary injunction, many of these practices still continue. Furthermore, the evidence shows that defendants "engaged in a standard pattern of officially sanctioned behavior." *Id.* at 1324. *See infra,* Conclusions of Law 12–17. Injunctive relief is most appropriate to combat a pattern of illicit law enforcement behavior. *Id. See also Allee v. Medrano,* 416 U.S. 802, 812, 94 S.Ct. 2191, 2198, 40 L.Ed.2d 566 (1974); *Hague v. CIO,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). The Court further notes the absence of prudential limitations circumscribing federal court intervention in state law enforcement. *Compare Los Angeles v. Lyons,* 461 U.S. at 112, *with LaDuke v. Nelson,* 762 F.2d at 1324–25; *see also Nicacio v. INS,* 797 F.2d 700, 702 (9th Cir.1985). Finally, as in *LaDuke,* this suit is brought on behalf of a certified class. The evidence showed that this class faces a credible threat of recurrent injury and, indeed, has actually experienced repeated violations of the rights of its members. *La-*

*Duke* at 1325–26. *See also Nicacio,* 797 F.2d at 702.

B. *The Standard for Injunctive Relief*

8. To obtain a permanent injunction, plaintiffs must demonstrate the likelihood of substantial and immediate irreparable injury and the inadequacy of remedies at law. *Lyons,* 461 U.S. at 111, 103 S.Ct. 1660; *LaDuke,* 762 F.2d at 1330.

9. Additionally, injunctive relief is available to combat a persistent pattern of official misconduct. *Allee v. Medrano,* 416 U.S. at 815, 94 S.Ct. at 2200. *See also Nicacio,* 797 F.2d at 705–6; *LaDuke,* 762 F.2d at 1326.

C. *Coerced Signing of Voluntary Departure Agreements*

10. Plaintiffs have established the necessity of permanently enjoining INS coercion of class members. Plaintiff class members will suffer irreparable harm if they are summarily removed from the United States without being afforded the opportunity to exercise their rights to apply for asylum and relief from deportation. The Court cannot overstate the dire consequences attending an erroneous deprivation of these rights. Removal to a country overrun with civil war, violence, and government-sanctioned terrorist organizations may lead to the most serious of deprivations.

11. There is no adequate remedy at law to protect the rights of class members. Those detainees who sign for voluntary departure as a result of INS misconduct are immediately removed from this country. There is no intervening forum before which these detainees could obtain relief.

12. Plaintiffs are entitled to injunctive relief to protect their exercise of statutory and constitutional rights. *Perez–Funez v. District Director,* 619 F.Supp. 656, 669 (C.D.Cal.1985). Plaintiffs have demonstrated that INS engages in a persistent pattern and practice of misconduct which deprives plaintiff class members of their constitutional right to due process and statutory right to apply for political asylum and withholding of deportation, and their

right to have access to counsel and appropriate legal information about the deportation process. *Nicacio v. INS,* 797 F.2d at 705–706; *LaDuke v. Nelson,* 560 F.Supp. 158, 160–61 (E.D.Wash.1982), *aff'd,* 762 F.2d 1318 (9th Cir.1985), *modified,* 796 F.2d 309 (1986). Plaintiffs' proof demonstrates that defendants' conduct results from INS policies, and forms a pattern and practice of illegal conduct which is approved, authorized and/or ratified by INS personnel at all levels. *Pennsylvania v. Porter,* 659 F.2d 306 (3rd Cir.1981), *cert. denied,* 458 U.S. 1121, 102 S.Ct. 3509, 73 L.Ed.2d 1383 (1982).

13. INS' failure to take any disciplinary action or investigate misconduct of its officers which discourages Salvadorans from pursuing asylum claims ratifies such misconduct. *Pennsylvania v. Porter,* 480 F.Supp. 686 (W.D.Pa.1979), *aff'd in part and rev'd in part,* 659 F.2d 306 (3rd Cir. 1981).

14. The evidence demonstrates that prior to the issuance of the preliminary injunction, INS engaged in a pattern and practice of summarily removing Salvadorans from this country by obtaining their signatures on the voluntary departure form through intimidation, threats, and misrepresentation. The experiences to which class members testified illustrate a consistent pattern of INS officers and agents using a variety of techniques to obtain these waivers. *Nicacio v. INS,* 797 F.2d at 702.

15. INS has continued to engage in a pattern and practice of pressuring Salvadorans to accept voluntary departure despite the existence of the preliminary injunction. The fact that the government does not give the advisal of the right to apply for asylum to substantial numbers of Salvadorans, and that when administering the advisal, INS agents do so in a manner which undermines its effectiveness, establishes that continuing injunctive relief is required. *Id.; Allee v. Medrano,* 416 U.S. at 812, 94 S.Ct. at 2198 (1974).

16. The record before this Court establishes that INS engages in a pattern and practice of pressuring or intimidating Salvadorans who remain detained after the issuance of an OSC to request voluntary departure or voluntary deportation to El Salvador. There is substantial evidence of INS detention officers urging, cajoling, and using friendly persuasion to pressure Salvadorans to recant their requests for a hearing and to return voluntarily to El Salvador. That this conduct is officially condoned, even in the face of complaints, demonstrates that it is a *de facto* policy. The existence of a policy of making daily announcements about the availability of voluntary departure, coupled with the acknowledgement that the policy is designed to free-up scarce detention space, supports the conclusion that INS detention officers make a practice of pressuring detained Salvadorans to return to El Salvador. This conduct is not the result of isolated transgressions by a few overzealous officers, but, in fact, is a widespread and pervasive practice akin to a policy. *LaDuke v. Nelson,* 762 F.2d at 1326, 560 F.Supp. at 160–61; *Illinois Migrant Council v. Pilliod,* 398 F.Supp. 882, 903 (N.D.Ill.1975), *aff'd* 540 F.2d 1062, 1067 (7th Cir.1976), *reversed in part on other grounds, affirmed in part by an equally divided court,* 548 F.2d 715 (7th Cir.1977) (en banc).

17. This pattern of misconduct flows directly from the attitudes and misconceptions of INS officers and their superiors as to the merits of Salvadoran asylum claims and the motives of class members who flee El Salvador and enter this country. *See supra,* Findings of Fact 57–63.

18. The need for permanent injunctive relief is clearly established by defendants' persistence in engaging in conduct violating both the letter and spirit of the preliminary injunction and their failure to take corrective measures absent the compulsion of a court order. None of the causes of action are moot. The I–274 communicates no information regarding availability of asylum or that having a well-founded fear of persecution entitles the individual to reside in the United States to pursue an asylum claim. Nor does the I–274 inform class members that they can raise asylum as a defense in a deportation hearing. In stating that a deportation hearing is for the purpose of determining whether the alien is illegally in the country, without ever sug-

gesting the possibility of raising political asylum in such a hearing, the I–274 suggests to the class members who know they are in the United States illegally that the outcome of such a hearing is a foregone conclusion. But for the injunction in this case, agents would provide no information about raising asylum in a deportation hearing; as a result of the injunction, agents provide the advisal but no further information.

### D. *Notification of Rights*

19. The Refugee Act of 1980 broadened the standard applicable to the determination of political asylum claims. Under this law, applicants eligible for asylum must establish a "well-founded fear of persecution" because of race, religion, nationality, political opinion, or membership in a social group. This standard marks a change from the earlier "clear probability of persecution" standard. 8 U.S.C. § 1101(a)(42); *Cardoza–Fonesca v. INS*, — U.S. —, 107 S.Ct. 1207, 1212, 94 L.Ed.2d 434 (1987).

20. The 1980 Refugee Act also established withholding of deportation as a mandatory form of relief, providing that deportation must be withheld for persons whose life or liberty would thereby be endangered. *INS v. Stevic*, 467 U.S. 407, 421 at n. 15, 104 S.Ct. 2489 at n. 15, 2496, 81 L.Ed.2d 321 (1984); *McMullen v. INS*, 658 F.2d 1312, 1316 (9th Cir.1981). The standard for this relief is different than that for asylum, this relief is only available in the context of a deportation hearing, and INS regulations provide that an application for political asylum is also considered an application for withholding of deportation. 8 C.F.R. § 208.3. Thus, entitlement to this mandatory relief constitutes a separate interest which is jeopardized by the administrative voluntary departure process.

■ 21. Notification of the right to apply for asylum and for relief from deportation is mandated by the Refugee Act, which confers these rights. Notice is required in order to fully effectuate the intent behind the Refugee Act. *Orantes–Hernandez*, 541 F.Supp. at 374–76. *See also Nunez v. Boldin*, 537 F.Supp. at 584.

22. The decision en banc of the Eleventh Circuit in *Jean v. Nelson* does not require a different ruling. The Court therein recognized that Congress made no direct reference to a notice requirement and held that none could be implied, since Congress provides many opportunities without requiring the government to publicize their availability. 727 F.2d at 982. However, few of those other "opportunities" arise in circumstances so perilous as those in which class members find themselves. The situations of those who have fled El Salvador, detailed *supra*, are not typical of the various opportunities which Congress has provided to others within the United States. For class members who have entered this country illegally, and who have been subject to defendants' coercive practices, notice of the right to apply for asylum is necessary to effectuate the intent of the Refugee Act.

23. Notice is also required in order to ensure that class members' waiver of rights is knowingly, voluntarily, and intelligently made. Signing of voluntary departure forms amounts to a waiver of the rights to apply for asylum and mandatory relief from deportation. Such a waiver must be knowingly and intelligently made. *See discussion Orantes–Hernnandez*, 541 F.Supp. at 376–78. *See also Johnson v. Zerbst*, 304 U.S. 458, 464–65, 58 S.Ct. 1019, 1022–23, 82 L.Ed. 1461 (1938). The evidence that voluntary departure agreements are often obtained in coercive circumstances supports a remedy in the form of a notice of rights.

24. Under *Matthews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903, the Court must engage in a three-part balancing test for the resolution of due process issues. The Court must first consider the private interest affected by the challenged actions. Next, the Court must evaluate the risk of erroneous deprivation of rights under the challenged procedures and the value, if any, of additional safeguards. Finally, the Court must balance the government's interest, taking into consideration the function involved and the burden imposed by additional safeguards. This test must be applied to the determination of whether the

procedures used by the INS to obtain administration voluntary departure for class members comply with due process. The administrative voluntary departure procedure used by the INS operates precisely to deprive class members of their rights to a hearing, to apply for political asylum, and to withholding of deportation. It is a particularly final deprivation, resulting in summary removal from the United States.

■ 25. Class members possess an important interest in their claims to political asylum and relief from deportation to El Salvador. The right to a deportation hearing and the various rights associated therewith, including the right to apply for political asylum, constitute a substantial liberty interest. *Wong Yang Sun v. McGrath*, 339 U.S. 33, 50, 70 S.Ct. 445, 454, 94 L.Ed. 616 (1950); *Perez–Funez*, 619 F.Supp. at 659–60. The consequences attending an erroneous deprivation of these rights are most serious.

26. A substantial number of class members have *bona fide* claims to political asylum and/or mandatory withholding of deportation. Testimony from class members demonstrates *prima facie* eligibility for asylum, according to the standards established by existing case law. *See, e.g., Blanco–Comarribas v. INS*, 830 F.2d 1039 (9th Cir.1987); *Platero–Cortez v. INS*, 804 F.2d 1127 (9th Cir.1986).

27. The procedures used by the INS in implementing the administrative voluntary departure procedure for Salvadorans are extremely likely to result and have resulted in the deprivation of class members' rights to a deportation hearing, to apply for political asylum, and to have deportation withheld.

28. Both before and after the issuance of the preliminary injunction in this case, the INS has engaged in a pattern and practice of conduct of encouraging Salvadorans to accept voluntary departure, and of discouraging them from pursuing political asylum claims. This conduct in itself assures that class members with *prima facie* claims for asylum will be deprived of the opportunity to present them. Provision of notice of the right to apply for asylum is fully justified as a remedy for this misconduct.

29. In addition, INS processing procedures do not identify and protect the rights of those Salvadorans who have a well-founded fear of persecution on return to their country, and are not reasonably calculated to do so. INS agents are not required to question detainees as to why they left their home country.

30. Even when a detainee indicates that he or she fled because of fear of persecution, agents are not required to note this information. Moreover, but for the injunction in this case, even those class members expressing fear of persecution in El Salvador would not be informed by INS at any time of their right to apply for political asylum.

31. The likelihood of erroneous deprivation of rights is increased by the circumstances of arrest and processing. Many class members flee El Salvador because of a fear of persecution by authorities and are unlikely to express that fear to uniformed Border Patrol agents, absent an assurance that they may have a right to remain in the United States. The arrest by INS itself is frequently intimidating, and plaintiff and defendant witnesses concurred that Salvadorans are apprehensive at the time of processing.

32. The evidence establishes that many Salvadorans do not know of the right to asylum before they come to the United States. Of those witnesses who had heard of political asylum, many had serious misconceptions which led them to believe it could not apply to them. This lack of knowledge and understanding adds to the likelihood of erroneous deprivation of rights.

33. Even were the government to automatically process Salvadorans for hearing, there would be a substantial likelihood of erroneous deprivation of the rights to apply for asylum and to receive withholding of deportation, unless a notice of rights is given. In general, the immigration court will notify a detainee of the right to asylum only when the alien declines to designate a country of deportation. 8 C.F.R.

§ 242.17(c) (1982); *Duran v. INS*, 756 F.2d 1338 (9th Cir.1985); *Ramirez–Osorio v. INS*, 745 F.2d 937 (5th Cir.1984).

34. Moreover, uncontradicted evidence established that, at least in some immigration courts, immigration court procedures do not safeguard the rights of unrepresented class members. For example, uncontradicted evidence showed that such proceedings in Los Angeles may not always be fully translated. It further showed that non-English speaking detainees unrepresented by counsel often have virtually no understanding of the proceedings.

35. Another indication of the strong likelihood of erroneous deprivation is the fact that several class members who have been granted political asylum signed for voluntary departure during their processing and would have been removed from the United States but for fortuitous circumstances.

36. INS post-processing procedures also contribute to the likelihood of erroneous deprivation. Notification of rights will to some extent lessen the coercive impact of other INS practices.

37. The experience under the preliminary injunction has already established that provision of an advisal of the right to seek political asylum helps to prevent the erroneous deprivation of this right through the administrative voluntary departure procedure.

38. Providing an advisal of the right to seek political asylum to detained Salvadorans imposes no substantial burden on the government. After nearly five years of operating under the preliminary injunction, the government was not able to present any evidence of such burden.

39. The evidence in this case has established that, contrary to the representations relied upon by the courts in *Ramirez–Osorio*, 745 F.2d at 941, 943, and *Duran*, 756 F.2d at 1341, the INS does *not* identify detained class members likely to have a well-founded fear of persecution, nor does it notify them of the right to apply for political asylum. Even when class members express fear of return to El Salvador to INS processing officers, INS does not note the information and the class member is not generally informed of political asylum or withholding of deportation.

40. The courts in *Ramirez–Osorio* and *Duran*, addressing only the issue of whether blanket notice of the right to asylum must be provided to all aliens by the immigration court, did not consider the actual procedures used by the INS in processing class members. These decisions, based on an erroneous representation of the nature of such procedures, do not preclude this Court from finding that these procedures present a substantial likelihood that detained Salvadorans will be erroneously deprived of their rights to apply for political asylum and withholding of deportation.

41. The court in *Duran* held only that the immigration court need not give blanket notice of the right to asylum under the applicable regulation. The court in *Ramirez–Osorio* also found that blanket provision of notice of the right to asylum would substantially burden the government by giving rise to frivolous asylum claims. Notice limited to the class of detained Salvadorans does not present this danger, and the government presented no evidence of any such problem arising under more than four years' experience with the preliminary injunction.

42. Injunctive relief requiring the administration of an advisal of rights to detained Salvadorans does not mandate the provision of the same advisal to any other nationalities. The calculation of the *Matthews* balancing test could be quite different for other nationalities.

43. Evidence also established that the Justice Department routinely differentiates among nationalities in the area of immigration: for example, in the use of special processing procedures for Mexican nationals; in grants of extended voluntary departure status to particular nationalities; and in the designation of nationalities to be subject to "immediate action procedure." Differentiating among nationalities in the provision of an advisal of rights therefore should not burden defendants.

### E. INS Transfer Policy

44. The Attorney General has broad discretion to determine the place of detention for aliens in the custody of INS. 8 U.S.C. § 1252(c). However, this discretion must be exercised in a manner consistent with the constitutional and statutory rights of detainees.

45. Aliens have both statutory and due process rights to retain counsel of their choice. 8 U.S.C. §§ 1252(b)(2), 1362; *Rios–Berrios*, 776 F.2d 859, 862 (9th Cir.1985); *Orantes–Hernandez*, 541 F.Supp. at 384; *Nunez*, 537 F.Supp. at 582. Regulations and practices that unjustifiably obstruct this representation must be invalidated. *Orantes–Hernandez*, 541 F.Supp. at 384; *Nunez*, 537 F.Supp. at 582.

46. Plaintiffs have provided substantial evidence regarding INS' transfer policy and the extent to which it prejudices detainees and interferes with their constitutional and statutory rights to effective assistance of counsel. The deprivation of those rights entitles plaintiffs to injunctive relief which will militate against the pernicious effects of this policy. *LaDuke v. Nelson*, 762 F.2d at 1326; *Loya v. INS*, 583 F.2d 1110, 1114 (9th Cir.1978); *Perez–Funez*, 619 F.Supp. at 669.

47. INS' policy of immediately transferring aliens to remote detention facilities impairs their ability to exercise their rights to retained counsel. *Louis v. Meissner*, 530 F.Supp. 924, 927 (S.D.Fla.1981), *aff'd in part and rev'd in part, Jean v. Nelson, supra*. Often, detainees are transferred to locations where representation is not readily available.

48. Transfer of detainees who are represented by counsel interferes with the attorney-client relationship. *Id.; Chavez–Galen v. INS*, No. 80–485T (W.D.Wash. 2/3/87). Although INS purports to have a policy of not transferring aliens who are represented by counsel, the evidence showed otherwise.

49. The Ninth Circuit's decision in *Committee of Central American Refugees v. INS*, 795 F.2d 1434 (9th Cir.1986), does not preclude the Court from granting injunctive relief in this case. In *Central American Refugees*, the Ninth Circuit upheld the district court's refusal to enjoin INS' transfer policy because of a lack of evidence that the policy resulted in a deprivation of due process rights. The Court specifically described the case before it as one in which an injunction was requested notwithstanding the fact that no attorney-client relationship had been established, distinguishing *Chavez–Galen* and *Bocanegra–Leos v. Dahlin*, No. 78–313 (D.Or. 4/7/78). The comprehensive evidence before this Court clearly establishes transfers in the face of such established relationships.

50. The evidence before this Court is also quite different from that upon which the judge in *Committee of Central American Refugees v. INS*, 682 F.Supp. 1055 (N.D.Cal.1988), based his final ruling. These differences justify a different result herein. Although the Court agrees that a transfer pursuant to 8 U.S.C. § 1252(c), standing alone, is not a violation of plaintiffs' due process or statutory rights to assistance of counsel, the evidence in the instant case establishes a pattern and practice of transferring detained Salvadorans irrespective of established attorney-client relationships. This pattern and practice arises as a consequence of defendants' erroneous beliefs and opinions regarding Salvadoran nationals, and is conducted with the intent of encouraging class members to voluntarily return to El Salvador, thereby depriving them of their rights to withholding of deportation and to apply for asylum. Although plaintiffs may have failed to carry their burden of proof in *Central American Refugees*, they have in this case established a pattern of misconduct.

### F. Access to Counsel and Other Matters

51. INS is obligated to provide a legal services list before offering voluntary departure to a class member, *Orantes–Hernandez*, 541 F.Supp. at 386, and whenever it serves an order to show cause placing a person in deportation proceedings. 8 C.F.R. § 242.1(c) (1987). INS is also obligated to distribute a legal services list to any unaccompanied minor after apprehension and during processing. *Perez–Funez*, 619 F.Supp. at 668, 670.

52. It is the duty of the district director to maintain a current legal services list. 8 C.F.R. § 292a.1 (1987); *Perez–Funez,* 619 F.Supp. at 668.

53. INS violated the preliminary injunction, the *Perez–Funez* injunction, and its own regulations by failing to distribute and by distributing inaccurate, incomplete or misleading legal services lists to class members. *Orantes–Hernandez,* 541 F.Supp. at 386; *Perez–Funez,* at 670; 8 C.F.R. § 242.1(c) (1987).

54. INS violated its own regulations by denying or refusing to act upon applications of qualified legal services organizations to be included in the list. 8 C.F.R. § 292.2 (1987).

55. INS violates its own operating instructions by failing to enforce the requirement that misconduct of INS employees be reported to supervisory personnel or the Office of Professional Responsibility (OPR). O.I. 287 10(g), 287 10(e)(1).

56. INS' failure to provide an adequate mechanism for class members to report to the OPR any misconduct by INS personnel, including coercion not to apply for asylum, supports the finding that INS engages in a pattern and practice to discourage Salvadorans from applying for asylum.

57. INS practices and procedures at detention centers and other locations where class members are detained coerce and discourage class members from exercising and pursuing asylum.

58. Plaintiffs also have a fundamental right of access to courts. *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Morrow v. Harwell,* 768 F.2d 619 (5th Cir.1985); *Johnson by Johnson v. Brelje,* 701 F.2d 1201, 1207 (7th Cir.1983); *Nunez* 537 F.Supp. at 581. Detention officials must not only refrain from placing obstacles in the way of communication between detainees and their attorneys, but are obligated to affirmatively provide detainees with legal assistance. *Id.; Bounds v. Smith,* 430 U.S. at 824, 97 S.Ct. at 1496. This duty may be satisfied by the provision of an adequate law library, by defendants' providing unrepresented detainees with legal representation, or by such combination of these elements that would pass constitutional muster. *Id.* at 828, 97 S.Ct. at 1498; *Green v. Ferrell,* 801 F.2d 765, 772 (5th Cir.), *reh'g denied,* 807 F.2d 995 (5th Cir.1986); *Lindquist v. Idaho State Board of Corrections,* 776 F.2d 851 (9th Cir.1985); *Morrow v. Harwell,* 768 F.2d at 623; *Cepulonis v. Fair,* 732 F.2d 1, 2 (1st Cir.1984). A well supplied law library only provides adequate access to courts if the inmates have sufficient opportunity to browse through the materials. *See Green,* 801 F.2d at 772; *Cepulonis,* 732 F.2d at 4.

59. Defendants have a constitutional duty not to obstruct plaintiffs' access to courts. *Procunier v. Martinez,* 416 U.S. 396, 419, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974). This duty protects detained plaintiffs' privacy in their communications with their attorneys. *Wolff v. McDonnell,* 418 U.S. 539, 575–76, 94 S.Ct. 2963, 2984–85, 41 L.Ed.2d 935 (1974); *Guajardo v. Estelle,* 580 F.2d 748, 757–59 (5th Cir.1978); *Taylor v. Sterrett,* 532 F.2d 462, 473–74 (5th Cir.1976); *Gaines v. Lane,* 790 F.2d 1299, 1305–06 (7th Cir.1986); *Nunez v. Boldin,* 537 F.Supp. at 582–83. The duty not to obstruct access to courts also protects detained class members' right of telephonic access to their legal representatives. *Johnson by Johnson v. Brelje,* 701 F.2d at 1207. Barring or unduly limiting paralegal access to detainees and to detention centers is also constitutionally impermissible. *Procunier v. Martinez,* 416 U.S. at 419–20, 94 S.Ct. at 1814; *Orantes–Hernandez,* 541 F.Supp. at 385; *Nunez,* 537 F.Supp. at 582.

60. Detained class members have a First Amendment right of access to information. *Pepperling v. Crist,* 678 F.2d 787 (9th Cir.1982); *Abdul Wali v. Coughlin,* 754 F.2d 1015 (2nd Cir.1985). This right may not be restricted by the government's attempt to eliminate "unflattering or unwelcome opinions or factually inaccurate statements." *Procunier v. Martinez,* 416 U.S. at 413–14, 94 S.Ct. at 1811.

61. Confiscation of legal materials interferes with the right of access to courts. *Tyler v. Woodson,* 597 F.2d 643, 644 (8th Cir.1979) (per curiam); *Bonner v. Coughlin,* 517 F.2d 1311, 1320 (7th Cir.

1975), *modified on other grounds,* 545 F.2d 565 (7th Cir.1976) (en banc), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed. 2d 529 (1978); *Stringer v. Thomson,* 537 F.Supp. 133, 137 (N.D.Ill.1982).

■ 62. Pursuant to the fundamental right of access to courts, detainees have a right of access to writing materials. *Bounds v. Smith,* 430 U.S. at 824, 97 S.Ct. at 1496 (1977).

■ 63. Defendants have violated detained plaintiff class members' right of access to courts by failing to provide adequate law libraries, failing to provide legal self-help materials, failing to provide adequate access to writing materials, and in some cases confiscating legal rights materials.

■ 64. Defendants have violated detained plaintiff class members' rights to effective representation of counsel by unduly restricting attorney and paralegal visitation, failing to provide private telephone and visitation facilities, and in some cases failing to provide adequate telephone access.

65. Defendants have violated detained class members' First Amendment right to receive information by confiscating legal rights materials and other written materials.

■ 66. Defendants have violated the letter and spirit of the preliminary injunction by continuing to place class members in solitary confinement for disciplinary purposes but under the guise of "administrative segregation", without the benefit of procedural protections. Whatever the label, detained class members are entitled, at a minimum, to notice of the charges, an opportunity to be heard, and a written statement of reasons before being placed in solitary confinement. *Wolff v. McDonnell,* 418 U.S. at 58, 94 S.Ct. at 2976; *Orantes–Hernandez,* 541 F.Supp. at 385.

Having concluded that plaintiff class members will suffer irreparable relief if permanent injunctive relief is denied, that no adequate remedy at law exists to protect the rights of class members, and that plaintiffs have prevailed on the merits, IT IS HEREBY ORDERED that defendants,

their agents and successors in office are permanently enjoined as follows:

1. Defendants shall not employ threats, misrepresentation, subterfuge or other forms of coercion, or in any other way attempt to persuade or dissuade class members when informing them of the availability of voluntary departure pursuant to 8 U.S.C. § 1252(b). The prohibited acts include, but are not limited to:

(a) Misrepresenting the meaning of political asylum and giving improper and incomplete legal advice to detained class members;

(b) Telling class members that if they apply for asylum they will remain in detention for a long period of time, without mentioning the possibility of release on bond or indicating that bond can be lowered by an immigration judge and that there are bond agencies which can provide assistance;

(c) Telling Salvadoran detainees the amount of bond given to other class members, without indicating that the bond amount ultimately depends upon the circumstances of the individual class member;

(d) Telling class members that their asylum applications will be denied, that Salvadorans do not get asylum, or that asylum is only available to guerillas or soldiers;

(e) Representing to class members that the information on the asylum application will be sent to El Salvador;

(f) Representing to class members that asylum applicants will never be able to return to El Salvador;

(g) Indicating that Salvadoran detainees will be transferred to remote locations if they do not elect voluntary departure;

(h) Advising Salvadorans of the negative aspects of choosing a deportation hearing without informing them of the positive options that are available;

(i) Refusing to allow class members to contact an attorney; and

(j) Making daily announcements at detention facilities of the availability of voluntary departure.

The Court highly recommends the use of videotaped information on immigration proceedings, such as is now being used at El Centro and Oakdale, and suggests that all interested parties cooperate in the production of such videos for use in all detention facilities.

2. At the time any class member is processed, whether or not he or she is automatically processed for a hearing, Defendants shall inform the class member of the existence of his or her rights to be represented by an attorney, to request a deportation hearing, and to apply for political asylum. For those class members who are informed of the availability of voluntary departure pursuant to 8 U.S.C. § 1252(b), such notice shall be given before voluntary departure is discussed. The parties are to confer among themselves and with experts to prepare a simplified and consolidated rights advisal, using Plaintiff's Exhibit 374 as a model. This advisal should be prepared within thirty days of the filing of this opinion and submitted to the Court for approval. Once approved, it shall be read and provided to class members in the same manner as under the preliminary injunction; specifically, Defendants shall:

(a) Provide the class member with a copy of the advisal and a copy of the free legal services list compiled pursuant to 8 C.F.R. § 292a.1 and permit the class member to retain these in his or her possession;

(b) Inquire as to whether the class member can read, and if the class member indicates that he or she cannot read, the advisal shall be read verbatim to the class member in Spanish and English; and

(c) Obtain a signed acknowledgement on a separate copy of the approved advisal from the class member showing that the aforesaid notices have been provided.

3. If, after receiving the above notice, the class member informs Defendants that he or she wishes to apply for political asylum and/or a deportation hearing, or otherwise indicates that he or she fears returning to El Salvador, Defendants shall not advise, encourage, or persuade the class member to change his or her decision. Specifically, Defendants are to avoid the practices indicated in paragraph 1(a)–(j)

above, although that listing is not exhaustive.

4. Defendants shall provide class members with access to telephones during processing.

5. Defendants shall revise and maintain updated and accurate legal services lists.

(a) Such lists must include all organizations that wish to be included who "are available to render such free legal services by representation in deportation or exclusion proceedings." 8 C.F.R. § 292a.2. Organizations should be permitted to identify the scope of their representation on the legal services list.

(b) Defendants shall cooperate with other interested parties in compiling and maintaining legal services lists.

(c) Defendants shall provide such lists to detainees at the time of processing and whenever a class member is transferred to a new facility. Such lists should also be made freely available at all detention facilities.

6. The INS shall assign an officer with a published phone number in each of its four regional offices to provide information on Salvadorans detained in the region.

(a) Interested relatives and counsel, if they give the person's name to the INS officer, will be informed of this person's location. If the class member is scheduled for voluntary departure, the inquiring individual should also be informed of the date, time, and place from which the class member is scheduled to leave.

(b) This information may be obtained by calling the designated phone number only during the normal working hours of the region. The above information will be made available as soon as practicable. For persons scheduled for departure, the information should be available as soon as practicable after travel documents have been obtained, but in any event, at least 24 hours prior to actual departure.

(c) If an attorney informs the officer that he or she wishes to communicate with a specifically identified member of the plaintiff class who is scheduled for voluntary departure, and that he or she has not

yet been able to do so, Defendants shall not expel the plaintiff class member until such counsel has had a reasonable opportunity for such communication.

7.   Once a written notice of appearance has been made by an attorney on behalf of any member of the plaintiff class, Defendants shall:

(a) Give counsel 24 hours actual advance notice of the date, time, and place of the intended removal before removing the class member from the United States;

(b) Permit counsel to rescind an agreement to voluntarily depart on behalf of the class member;

(c) Allow paralegal assistants working under the supervision of counsel to have access to class members even though the paralegals are unaccompanied by counsel;

(d) Allow counsel or paralegals working under the supervision of counsel reasonable access to class members between the hours of 9:00 a.m. and 9:30 p.m., excluding such time as is necessary for reasonable security procedures.   Detainees should be given the option to meet with their legal representatives during meal hours;  and

(e) Provide at least one telephone per twenty-five (25) detainees at detention centers.   Defendants shall ensure the privacy of attorney-client communications, through the use of privacy panels between telephones or other effective means.   The Court wishes to ensure the utmost confidentiality between detainees and their legal representatives.

8.   Defendants shall permit detained class members to receive and possess legal materials explaining United States immigration law and procedure, and any other written materials unless possession of such materials would conflict with the maintenance of institutional security.   Incoming written materials should not be confiscated except for materials reasonably defined as contraband or matters which pose a genuine risk to security.   Writing materials, including paper, pencils, pens, and access to typewriters, must be made available in detention facilities.

9.   Defendants shall provide detained class members with those legal materials regarding immigration matters which are currently available in both English and Spanish, and should work in conjunction with counsel for plaintiffs to produce additional materials in Spanish.   Detention center law libraries should be sufficiently accessible to detainees.

10.   Defendants shall not place any class member in solitary confinement for a period of more than 24 hours except upon good cause shown and unless said class member has been provided:

(a) Written notice of the charges in advance of the hearing;

(b) An opportunity to appear at a hearing before impartial fact-finders and to present witnesses and documentary evidence at the hearing prior to placement in solitary confinement;  and

(c) A written statement of the reasons for any decision to discipline the class member.

These procedural protections shall apply whether the confinement is referred to as "disciplinary" or "administrative" segregation or by any other name.

11(a) Defendants shall not transfer detained class members who are unrepresented by counsel from the district of their apprehension for at least seven (7) days to afford class members the opportunity to obtain counsel.

(b) Where a class member is represented by counsel or obtains counsel during the seven-day period described above, he or she can be transferred to other locations in accordance with 8 U.S.C. § 1252(c); however, venue shall remain in the district where the class member's counsel is located.   Furthermore, the class member must be returned to the district in which venue is set sufficiently in advance of any proceeding in order to allow the detainee adequate time to consult with counsel.   The class member must be returned within a reasonable time after receiving a request to do so from the detainee's counsel.

Plaintiffs are requested to submit a proposed judgment, prepared in accordance with these Findings of Fact and Conclu-

**1514**

sions of Law, no later than fourteen (14) days following the filing of this document.

IT IS SO ORDERED.